Alvin Joel TYLER, Plaintiff–Appellee
Cross–Appellant,

v.

BETHLEHEM STEEL CORPORATION,
Defendant–Appellant Cross–
Appellee.

Nos. 733, 920, Dockets 91–7908, 91–7918.

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1992.

Decided March 10, 1992.

Thomas S. Gill, Buffalo, N.Y. (Saperston & Day, P.C., Thomas F. Knab, of counsel), for plaintiff-appellee cross-appellant.

Michael R. Moravec, Buffalo, N.Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, David K. Floyd, of counsel), for defendant-appellant cross-appellee.

Before OAKES, Chief Judge, PRATT and MINER, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Twenty-two-year-old Alvin Joel Tyler went to work for Bethlehem Steel Corporation on July 5, 1960. After 26 years of service, Bethlehem on July 10, 1986, fired him, or as the corporation put it, placed him on "permanent layoff". In this diversity case brought under New York's Human Rights Law, N.Y.Exec.Law §§ 290–301 (McKinney 1982 & Supp.1992), a jury awarded Tyler $995,000 in damages for age discrimination.

On appeal, Bethlehem claims that the jury's verdict was against the weight of the evidence, that the district court improperly allocated the burdens of proof in its instructions, that the jury's award was speculative and based on erroneously-admitted expert testimony, and that the issue of "front pay" is an equitable one which should not have been sent to the jury. On his cross-appeal, Tyler contends that Judge Curtin should have allowed his claim for punitive damages to go to the jury. We reject all of these arguments and affirm the judgment of the district court.

## FACTS AND BACKGROUND

When Bethlehem fired the 48–year–old Tyler in 1986, he was serving as a general products salesman. Officially assigned to Bethlehem's Buffalo office, Tyler had also been working in Bethlehem's Pittsburgh office approximately one week every month, "because they were short of people down there and they needed sales personnel". The Pittsburgh office was busy: there, Tyler had "more work th[a]n I could handle".

Starting sometime around 1970, Bethlehem developed a performance appraisal system for its employees. Under this system, employees would be ranked "outstanding", "very good", "good", "acceptable", "marginal", "unsatisfactory", or "not rated" (for those "too new on the job" to evaluate). From 1970 through 1984, all of Tyler's performance appraisals were at least "very good", if not "outstanding".

On November 28, 1984, resident sales manager Edwin W. Janes conducted Tyler's appraisal and ranked him "very good". But two months later, regional sales manager Michael D. Sawyer, who was located in Cleveland and had not observed Tyler's performance in 1984, decided to re-appraise Tyler because of complaints from two of Tyler's customers. Sawyer downgraded Tyler's overall rating to "marginal", indicated that "Tyler's performance has continued to deteriorate", and concluded that "without an immediate improvement in his performance, I recommend he be terminated in six months". Tyler generally disputed the allegations contained in Sawyer's re-appraisal.

During 1985, Tyler worked with Janes to improve the areas Sawyer had identified as deficient. At these meetings, Janes was "generally complimentary" and indicated that Tyler was making "good progress". Tyler survived the six-month termination deadline (characterized by Bethlehem as a "probationary period"), and continued to work for Bethlehem. For 1985, Janes evaluated Tyler as "good".

On June 27, 1986, Janes sent a memorandum to W.T. deHaven, district manager of Bethlehem's Pittsburgh sales office, recommending that Bethlehem shut down the Buffalo sales office. He made a number of other recommendations, including "Lay off A.J. Tyler (Age 48, twenty-six years service)." Sawyer testified that age and years of service were factors relevant to Bethlehem's pensions, savings plans, and insurance levels.

On July 9, 1986, while Tyler was on vacation, Janes called him and told him to

come into the office the next day to meet with both Janes and Sawyer. At that meeting, Janes and Sawyer informed Tyler that Bethlehem was closing its Buffalo sales office for economic reasons, and that Tyler was to be permanently laid off. Tyler asked if there was any possibility of a transfer to the Pittsburgh sales office, but Janes and Sawyer said there were no transfer possibilities.

In fact, a short time before Tyler's termination, Sawyer had inquired of deHaven about a transfer for Tyler. Although there was an opening in the Pittsburgh office at that time, deHaven said he was going to transfer Frank Weber, a 47–year–old customer sales assistant, into that position. However, Weber was not transferred, and the Pittsburgh sales position was left vacant until October 1, 1986, when it was given to David Moules, a 26–year–old wire salesman with only four years' service. Moules had already resigned from Bethlehem once, was dissatisfied with his position as a wire salesman with Bethlehem, and eventually quit the general sales position in June 1987. Thus, Bethlehem fired the 48–year–old Tyler after denying his request for a transfer to Pittsburgh, a transfer it soon gave to a relatively inexperienced, disgruntled salesman barely half Tyler's age.

Between July 1986 and November 1987, Bethlehem transferred a total of 13 sales people, all of them younger than Tyler. One of the two oldest was Weber, who finally gained the Pittsburgh sales position when Moules quit. In making its transfer decisions, Bethlehem relied on several factors, one of which was the performance appraisal, several of which referred to the employees' "youth" in a positive manner. One candidate, 25 years old at the time, was given the following accolade:

> All indications point to "Young Tiger" classification. We will continue to follow closely; feel we have a future "High Potential" individual here.

After Tyler was fired, Bethlehem hired 12 new sales representatives and put them through Bethlehem's training program. Ten of the 12 were hired directly from college campuses. Daniel Land, Bethlehem's manager of sales and marketing administration, explained why:

> [W]e have had a lot of unplanned attrition during the time period of 1982 to the present. We have seen the demographics of our sales organization shift gradually upwards so that, as I [explained] earlier, some 56, 57 percent of our sales force is now between the ages of 45 and over. * * * [W]e are providing for the time when our sales force continues to age and gets to be—a greater percentage of them that are currently eligible for retirement then become eligible for retirement.

After trial, the jury found for Tyler in the sum of $995,000 broken down as follows: $310,000 for back pay, $667,000 for future lost earnings ("front pay"), and $18,000 for emotional distress. Bethlehem moved for judgment *non obstante veredicto*, or in the alternative, for a new trial. Tyler cross-moved for a new trial solely on the district court's refusal to submit his punitive damages claim to the jury. Judge Curtin denied both motions, and these cross-appeals followed.

## DISCUSSION

### A. *The Jury Instruction*

Bethlehem's challenge to the *"Price Waterhouse"* instruction given to the jury draws us into the murky water of shifting burdens in discrimination cases. Judge Curtin instructed the jury:

> If you find that plaintiff has failed to prove that his age was a motivating factor in the defendant's decision, then you must find for the defendant. If, however, the plaintiff has established each of the elements of this claim, then you will turn to defendant's defenses as to which the defendant bears the burden by a preponderance of the evidence; that is, if you find that the plaintiff has proven by a preponderance of the evidence that his age was a motivating factor in the defendant's decision to terminate[ ] him or refuse to transfer him, he is entitled to recover, unless the defendant establishes by a preponderance of the evi-

dence that it would have taken the same action regardless of plaintiff's age.

While this action was commenced as a diversity action under New York's Human Rights Law, *see* N.Y.Exec.Law §§ 290–301 (1982 & Supp.1992), both parties agree that the elements of proof of liability for a case commenced under § 297(9) have been the same as those required under the federal age discrimination in employment act ("ADEA"); New York courts have consistently looked to federal caselaw in expounding the Human Rights Law. *See, e.g., Miller Brewing Co. v. State Div. of Human Rights,* 66 N.Y.2d 937, 938–39, 489 N.E.2d 745, 746–47, 498 N.Y.S.2d 776, 777–78 (1985); *Grumman Aerospace Corp. v. New York State Div. of Human Rights,* 151 A.D.2d 573, 573, 542 N.Y.S.2d 681, 682 (2d Dep't 1989) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)); *Ioele v. Alden Press, Inc.,* 145 A.D.2d 29, 35, 536 N.Y.S.2d 1000, 1003 (1st Dep't 1989). This makes sense, because the ultimate goals of the fact-finders in both federal and New York age discrimination actions are the same—to determine whether an adverse employment decision was made "because of" age. *Compare* 29 U.S.C. § 623(a)(1) *with* N.Y.Exec.Law § 296(1)(a). Similarly, our interpretations of the ADEA have relied on interpretations of title VII, "for the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.'" *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (quoting *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)). For this reason, we may analyze the jury instruction issue as if this were a case commenced under the ADEA or title VII.

Bethlehem characterizes the challenged instruction as a *"Price Waterhouse"* instruction and claims that it was error for Judge Curtin to give it, because *Price Waterhouse* requires the plaintiff to produce "direct evidence" of discrimination before the defendant can be saddled with the burden of proving that the same action would have been taken even in the absence of impermissible factors, and, according to

Bethlehem, Tyler did not produce such "direct evidence". Although he did not request a *"Price Waterhouse"* instruction himself, Tyler argues that the given instruction was justified by the evidence.

To properly address Bethlehem's argument, we need to consider three threshold problems. First, what are the differences between "pretext" and "mixed-motives" cases? Second, what are the holdings of *Price Waterhouse?* Third, what is "direct evidence" of discrimination? We address these issues *seriatim* before we reach the ultimate issue of whether the given jury instruction was erroneous.

1. **"Pretext" or "mixed-motives"?** Employment discrimination cases (whether brought under title VII or the ADEA) are frequently said to fall within one of two categories: "pretext" cases and "mixed-motives" cases. *See Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12. *See also Holo–Krome Co. v. NLRB,* 954 F.2d 108, 110 (2d Cir.1992).

■ **a. "Pretext" cases.** In "pretext" cases, the plaintiff must present facts sufficient to remove the most likely *bona fide* reasons for an employment action—the familiar *McDonnell Douglas v. Green* factors. 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53 & 253 n. 6, 101 S.Ct. 1089, 1093 & 1094 n. 6, 67 L.Ed.2d 207 (1981). Once the plaintiff has met this burden of establishing a prima facie case (which "is not onerous", *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094), a defendant must then "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The defendant's task is merely to *articulate* (not *prove*), via admissible evidence, a legitimate reason for the employment decision. We have called this a "burden of production". *See, e.g., Holo–Krome,* at 110. This frames the ultimate issue for the plaintiff (did intentional discrimination occur?) with greater clarity. At that point, the plaintiff must have the

opportunity to demonstrate that the employer's proffered reason was not the "true reason" for the employment decision. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. This may be done either by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or by persuading the trier of fact that the employer's proffered explanation is unworthy of belief. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825.

■ **b. "Mixed-motives" cases.** If a plaintiff can convince the trier of fact that an impermissible criterion in fact entered into the employment decision, a somewhat different analysis takes place. In such a "mixed-motives" case, the plaintiff must initially show more than the "not onerous" *McDonnell Douglas–Burdine* factors. Should the plaintiff wish to prove his case as a "mixed-motives" case, he must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a "motivating" or "substantial" role in the employment decision. *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1795 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring) (quoting *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)); *Price Waterhouse,* 490 U.S. at 261–62, 109 S.Ct. at 1796–97 (O'Connor, J., concurring). *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If the plaintiff convinces the factfinder that the illegitimate factor played such a role, the employee has proved that the decision was made at least in part "because of" the illegitimate factor. At this point the employee is entitled to succeed subject only to the employer's opportunity to prove its "affirmative defense", *see Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. at 1788 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.); that is, "that it would have reached the same decision as to [the employee's employment] even in the absence of the" impermissible factor. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring); *id.* at 276–77, 109 S.Ct. at 1804 (O'Connor, J., concurring). *See Holo–Krome,* at 110.

**c. The Civil Rights Act of 1991.** In late November of last year, Congress culminated a two-year political struggle with the passage of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071. Section 107 of that act is addressed to one of the problems created by the split opinions in *Price Waterhouse,* and it amends title VII with this language: "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." This amendment embraces the same "motivating factor" standard for mixed-motives cases which we divine, *infra,* from the sundry opinions in *Price Waterhouse.*

In the same statute congress also provided for jury trials in title VII cases, overruling a consistent line of precedent, *e.g., Lehman v. Nakshian,* 453 U.S. 156, 164, 101 S.Ct. 2698, 2703, 69 L.Ed.2d 548 (1981), which held to the contrary. *See* Civil Rights Act of 1991, Pub.L. 102–166, § 102 (to be codified at 42 U.S.C. § 1981a(c)(1)).

■ Moreover, by this 1991 act, Congress has added a remedial twist to the picture: if a plaintiff proves that the impermissible factor was a "motivating factor" for the employment practice, but the defendant proves the "affirmative defense", *cf. Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. at 1788 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.), that it "would have taken the same action in the absence of the impermissible motivating factor", the court may still grant declaratory or injunctive relief, as well as attorney's fees and costs, *see* Civil Rights Act of 1991, Pub.L. No. 102–166, § 107(b)(3) (to be codified at 42 U.S.C. § 2000e–5(g)(2)(B)(i)), even though it is forbidden from "award[ing] damages or issu[ing] an order requiring any admission, reinstatement, hiring, pro-

motion, or payment". *Id.*, § 107(b)(3) (to be codified at 42 U.S.C. § 2000e–5(g)(2)(B)(ii)). We decline to express any opinion on the meaning of the 1991 act, because (1) there is currently a conflict among the EEOC and several courts regarding the retroactivity of the 1991 act, *compare, e.g., Mojica v. Gannett Co.,* 779 F.Supp. 94, 99 (N.D.Ill.1991) (retroactive) *with, e.g., Van Meter v. Barr,* 778 F.Supp. 83, 86 (D.D.C.1991) (not retroactive) *and* E.E.O.C. Notice No. 915.002 (Dec. 27, 1991) (not retroactive); (2) regardless of the act's retroactivity, we reach the same result on the issue of "mixed-motives" analysis; (3) as applied to the Human Rights Law, New York courts have yet to cast their lot with the new act and it would be presumptuous for us to assume that the state courts, without legislative direction, would incorporate this new federal statute into its Human Rights Law jurisprudence; (4) the Human Rights Law treats remedies in many respects differently than does federal law; and (5) there may be case-and-controversy difficulties with the remedial portion of this act which allows a plaintiff without a personal stake in the litigation to act as a private attorney general for purposes of obtaining declaratory or injunctive relief.

Because New York courts have in the past turned to federal law for guidance in administering the Human Rights Law, this amendment may have potential importance for future cases under the New York law. However, since New York courts have not yet spoken on the subject, we will not attempt to apply the new federal statute in this case.

**2.** *Price Waterhouse.* Our initial problem is created by the various *Price Waterhouse* opinions. While that case engendered four separate opinions in the Supreme Court, none commanded a majority of the justices. *See Price Waterhouse,* 490 U.S. at 231, 109 S.Ct. at 1780 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.); *id.* at 258, 109 S.Ct. at 1794 (White, J., concurring); *id.* at 261, 109 S.Ct. at 1796 (O'Connor, J., concurring); *id.* at 279, 109 S.Ct. at 1805 (Kennedy, J., dissenting) (joined by Rehnquist, C.J. and Scalia, J.). Our duty is to follow the Supreme Court's

holding, but with a six-justice majority splintered 4–1–1 in its reasoning, determining the precise holdings of *Price Waterhouse* is not an easy task. While we might be more reserved in expressing our frustration, one commentator has aptly summed up our predicament: "More than a mere agreement on the result is needed; without a majority rationale for the result, the Supreme Court abdicates its responsibility to the institutions and parties depending on it for direction. Each plurality decision thus represents a failure to fulfill the Court's obligations." Note, *Plurality Decisions and Judicial Decisionmaking,* 94 Harv. L.Rev. 1127, 1128 (1981). *See generally* John F. Davis & William L. Reynolds, *Juridical Cripples: Plurality Opinions in the Supreme Court,* 1974 Duke L.J. 59.

We are thus left with the unenviable task of divining the rationale of a Court which in fact had no single *ratio decidendi.* *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds' ") (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). *See also Litton Systems, Inc. v. American Tel. & Tel. Co.,* 700 F.2d 785, 808 n. 33 (2d Cir. 1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. Martino,* 664 F.2d 860, 872–73 (2d Cir. 1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). In essence, what we must do is find common ground shared by five or more justices. This is an especially important task in this case because Bethlehem claims that Tyler's burden as a result of *Price Waterhouse* was to show "direct evidence" that age was a substantial or motivating factor to merit the given jury instruction—a concept present in Justice O'Connor's separate concurring opinion, *see Price Waterhouse,* 490 U.S. at 271, 275, 276, 109 S.Ct. at 1801, 1803, 1804

(O'Connor, J., concurring), and embraced in the dissent's interpretation of the Court's holding. *See id.* at 280, 290, 109 S.Ct. at 1806, 1811 (Kennedy, J., dissenting). The requirement of "direct evidence" was not, however, adopted either by the plurality of four or by Justice White, so there was not majority support for this proposition. *See Hyatt Corp. v. NLRB*, 939 F.2d 361, 374 n. 5 (6th Cir.1991). In short, "direct evidence" was *not* a requirement imposed by the majority in *Price Waterhouse.* We will revisit this problem later.

The Court's split in *Price Waterhouse* was 4–1–1–3, with Justices White and O'Connor each "concurring in the judgment" with separate opinions. Naturally, both Justices White and O'Connor shared some common ground with the four-member plurality, but Justice White differed with the plurality only as to the specifics of the employer's burden. *Price Waterhouse*, 490 U.S. at 261, 109 S.Ct. at 1796 (White, J., concurring). In all other respects, Justice White agreed with the plurality that *Mt. Healthy* provided the proper framework for analyzing "mixed-motives" cases (*i.e.* where the plaintiff convinces the trier of fact "that the employer was motivated by both legitimate and illegitimate factors." *Price Waterhouse*, 490 U.S. at 259, 109 S.Ct. at 1795 (White, J., concurring)). Thus, before we consider further the problem of "direct evidence", we can conclude that a majority of the Supreme Court endorsed, in *Price Waterhouse*, the burden-shifting framework for mixed-motives cases that was articulated in *Mt. Healthy.*

**3. The problem of direct evidence.** In any event, the Civil Rights Act of 1991 does not address our biggest problem: whether *Price Waterhouse* requires the plaintiff to show "direct evidence" of discrimination as a precondition to shifting into mixed-motives analysis. Despite the inarguable fact that only *four* justices in *Price Waterhouse* would have imposed a "direct evidence" requirement for "mixed-motives" cases, most circuits have engrafted this requirement into caselaw. However, the various circuits have about as many definitions for "direct evidence" as they do employment discrimination cases.

We have not been immune from this ourselves. In a prior ADEA case following *Price Waterhouse,* we said that

> [o]nce the plaintiff establishes by direct evidence that an illegitimate factor played a motivating or substantial role in an employment decision, the burden falls to the defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegitimate factor into account.

*Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir.1989). *See also Jund v. Town of Hempstead*, 941 F.2d 1271, 1289 (2d Cir.1991); *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). Recently, we have equated "direct evidence" with evidence that "shows that the impermissible criterion played some part in the decision-making process." *Barbano v. Madison County*, 922 F.2d 139, 145 (2d Cir.1990). Bethlehem, however, would have us define "direct evidence" as non-"circumstantial" evidence. But "the basic problem with this touchstone is that 'direct evidence' of intent cannot exist, at least in the sense of evidence which, if believed, would establish the ultimate issue of intent to discriminate." Charles A. Sullivan, *Accounting For* Price Waterhouse: *Proving Disparate Treatment Under Title VII*, 56 Brook. L.Rev. 1107, 1138 (1991). *See Barbano*, 922 F.2d at 144–45.

We can, however, understand Bethlehem's confusion. Normally, "direct evidence" is described as evidence tending to show, without resort to inference, the existence of a fact in question. This is often contrasted with "circumstantial", or "indirect" evidence, which requires the factfinder to take certain inferential steps before the fact in question is proved. But, as Judge Posner correctly remarked in a recent ADEA case, "all knowledge is inferential". *Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir.1991) (*en banc*). *Compare Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir.1991) (plaintiff "may try to meet his [*Price Waterhouse*] burden head on by

presenting direct *or circumstantial* evidence that age was the determining factor in his discharge") (emphasis added); *Visser,* 924 F.2d at 664 n. 1 (Cudahy, J., dissenting) ("Incidentally, one may get into mixed motive analysis by presenting either direct *or* circumstantial evidence.") (emphasis in original); *Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) (reading *Price Waterhouse* as defining "direct evidence" in the negative; *i.e.,* not "stray remarks in the workplace", "statements by nondecisionmakers", or "statements by decisionmakers unrelated to the decisional process itself"); *Burns v. Gadsden State Comm. College,* 908 F.2d 1512, 1518–19 n. 9 (11th Cir.1990) (*per curiam*) (discriminatory remarks which "involv[ed] the kind of position for which the plaintiff applied", though not directed at plaintiff, were "direct evidence of discriminatory motive"); *and Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 48 (3d Cir.1989) (equating "direct evidence" with "smoking gun") *with Price Waterhouse,* 490 U.S. at 291, 109 S.Ct. at 1812 (Kennedy, J., dissenting) ("Courts will also be required to make the often subtle and difficult distinction between 'direct' and 'indirect' or 'circumstantial' evidence."); *Bruno v. City of Crown Point, Indiana,* 950 F.2d 355, 361 (7th Cir. 1991) ("Under *Price Waterhouse,* the plaintiff has the initial burden of proving by direct evidence that an impermissible factor * * * played a motivating part in an employment decision."); *Ramsey v. City and County of Denver,* 907 F.2d 1004, 1008–09 (10th Cir.1990); *Young v. City of Houston,* 906 F.2d 177, 180–81 (5th Cir.1990) (identifying and deftly avoiding the problem); *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990) ("direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee"); *Jackson v. Harvard Univ.,* 900 F.2d 464, 467 (1st Cir.) ("Direct evidence is evidence which, in and of itself, shows a discriminatory animus."), *cert. denied,* —— U.S. ——, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990); *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 315–16 (6th Cir.1989).

Requiring "direct evidence", *i.e.,* non-"circumstantial" evidence, as a precondition to shifting into the mixed-motives analysis runs afoul of more general evidentiary principles. "Conventional rules of civil litigation generally apply in Title VII cases", *Price Waterhouse,* 490 U.S. at 253, 109 S.Ct. at 1792, and presumably, the same goes for ADEA cases. One of those conventional rules is that "in any lawsuit, the plaintiff may prove his case by direct *or* circumstantial evidence." *United States Postal Serv. Bd. of Govs. v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983) (emphasis added). *See, e.g., O'Brien v. National Gypsum Co.,* 944 F.2d 69, 72 (2d Cir.1991) ("it is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts"); *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989) ("Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence."), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); 1A John Henry Wigmore, *Evidence in Trials at Common Law* § 24, at 944–52 (Tillers rev. 1983); Edward W. Cleary, *McCormick on Evidence* § 185, at 543 (3d ed. 1984); Richard O. Lempert & Stephen A. Saltzburg, *A Modern Approach to Evidence* 150–51 (2d ed. 1983). If a jury can give equal or greater weight to circumstantial evidence, then requiring only "direct" evidence to sustain a plaintiff's burden of proof is not only unhelpful, it is baffling. Juries are frequently (and correctly) instructed, as they were here, that "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." 1 Edward J. Devitt & Charles B. Blackmar, *Federal Jury Practice and Instructions* § 15.02, at 441–42 (3d ed. 1977). *See* 3 Leonard B. Sand *et al., Modern Federal Jury Instructions* ¶ 74.01, at 74–7 (1991); U.S. Fifth Circuit District Judges Association, *Pattern Jury Instructions: Civil Cases* § 2.18, at 22 (1991).

■ Can these seemingly irreconcilable requirements be reconciled? Perhaps we should remember that it is a *statute,* not

caselaw, that we are examining. New York's Human Rights Law, like the ADEA and title VII, is not a complex statute. All three of these statutes prohibit employers from making employment decisions "because of" age or other prohibited factors. A jury instruction need simply instruct the jury consonant with the statute. *McDonnell Douglas, Burdine,* and *Price Waterhouse* may be useful analytic constructs for district judges making nonjury decisions or ruling on motions for summary judgment, but we must remember that they are just that. All three were presented to the Supreme Court as title VII cases, where the option of a jury trial was formerly nonexistent. *See Lehman v. Nakshian,* 453 U.S. at 164, 101 S.Ct. at 2703; George Rutherglen, *Major Issues in the Federal Law of Employment Discrimination* 6–7 (Federal Judicial Center 2d ed. 1987). When a case is submitted to a jury, and the jury then concludes that a preponderance of *all* of the evidence (of whatever kind) shows that age was a motivating factor in the employer's decision, that is enough for the jury to shift its glance to the employer and require it to prove its affirmative defense that the decision would have been the same regardless of the employee's age (or any of the other, statutory, ADEA affirmative defenses). "Doing so is not unfair to a defendant; on the contrary, it accords the defendant the benefit of an affirmative defense." *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 878 (2d Cir.1988).

"Direct evidence", it seems, is an unfortunate choice of terminology for the sort of proof needed to establish a "mixed-motives" case. "Direct" and "indirect" describe not the quality of the evidence presented, but the manner in which the plaintiff proves his case. Strictly speaking, the only "direct evidence" that a decision was made "because of" an impermissible factor would be an admission by the decisionmaker such as "I fired him because he was too old." Even a highly-probative statement like "You're fired, old man" still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision. But juries have always been allowed to draw such inferences.

In contrast, *McDonnell Douglas–Burdine* ("pretext") analysis allows a plaintiff, a member of a protected class, who only suspects that the adverse employment consequences were caused by discrimination, to get into court by showing "that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). Once that is done, the employer must merely articulate a non-discriminatory reason so that the plaintiff can focus his or her proof of the ultimate fact on the employer's alleged reason for dismissal. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482; *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. At this point under the *McDonnell Douglas–Burdine* framework, the plaintiff may prevail in either of two ways: directly, "by persuading the court that a discriminatory reason more likely motivated the employer", or indirectly, "by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see also McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825.

Significantly for our purposes, the direct method of proof contemplated by the last step of *Burdine* is the same as the plaintiff's initial burden under *Price Waterhouse;* the only difference is that under *Price Waterhouse,* the plaintiff begins by focusing on the alleged discrimination itself, while the *McDonnell Douglas–Burdine* plaintiff starts by focusing on his own qualifications and the employer's needs. When the more focused proof of discrimination is presented, the court need not go through the *McDonnell Douglas* analysis.

More recently, in reviewing a NLRB decision, we noted that "it is possible to analyze all motivation cases * * * using only the dual motivation approach." *Holo-*

*Krome,* at 111. We noted there that the mixed-motives framework

> does not pause to require the employer only to articulate a valid motivation and then place on the [plaintiff] the burden of proving that the articulated explanation is a pretext. This approach differs from motivation inquiry in pretext cases. In that context, the plaintiff starts with the obligation only to present facts raising an inference of unlawful motivation and, if a valid reason is articulated by the defendant, must prove that the unlawful reason was at least part of the motivation. With dual motivation analysis, the defendant need do nothing until the plaintiff has proved unlawful motivation, and then has the burden of proving its affirmative defense.

*Holo–Krome,* at 111.

**4. Applying the legal standards.** Again, the ultimate question we ask in an ADEA case is: Was the plaintiff's employment status adversely affected "because of" his age? 29 U.S.C. § 623(a)(1). Under New York's Human Rights Law the ultimate question is the same. *See* N.Y.Exec. Law § 296(1)(a).

In addition to the portion of the jury charge quoted above, Judge Curtin further instructed the jury:

> In deciding whether or not Bethlehem intentionally discriminated against the plaintiff because of his age, you should consider whether plaintiff established the following facts: 1, whether he was satisfactorily performing his job; 2, that he was permanently laid off and the company refused to transfer him; 3, that the termination or denial of transfer occurred under circumstances giving rise to an inference that age was a motivating factor in the decision. I told you before that plaintiff is not required to prove that age was the sole or exclusive motivation for defendant's termination decision. If you find that age was one of the reasons that prompted the defendant to take that action, then you will consider the defendant's defenses as to which the defendant bears the burden of proof by a preponderance of the evidence.

Judge Curtin initially told the jury that Tyler had to prove that age was a "motivating factor" in Bethlehem's decision. If Tyler failed in this task, the jury was required to return a verdict for Bethlehem. In the event that Tyler proved that age was a motivating factor in Bethlehem's decision to terminate or refuse to transfer him, the jury was instructed to turn to Bethlehem's affirmative defenses, including "that it would have taken the same action regardless of plaintiff's age."

In light of our above discussion, the jury was charged consistently with *Price Waterhouse,* the ADEA, and the Human Rights Law. Tyler was held to the burden of proving, to the jury's satisfaction, that the adverse employment consequences were motivated, at least in part, by Tyler's age. The fact that Judge Curtin allowed the jury to draw "an inference that age was a motivating factor in the decision" does not create reversible error, since we have concluded above that a jury may reach its ultimate conclusion on the issue of discrimination through "direct" or "circumstantial" evidence.

Given the general verdict for Tyler on liability, the jury necessarily found that age was a motivating factor in Bethlehem's decision to fire Tyler and not transfer him. Similarly, the jury necessarily rejected Bethlehem's affirmative defense that tightening economic conditions would have compelled the same decision. These conclusions are amply supported by the evidence. Bethlehem's own witness, Daniel Land, testified that Bethlehem's sales force was getting too old; Tyler's layoff helped decrease the average age of Bethlehem's sales force. The internal memorandum recommending Tyler's layoff listed his age and years of service. The position which Tyler was filling in Pittsburgh, on a part-time basis, was left unfilled until Bethlehem could place the 26–year–old Moules in it. The performance appraisals of the Bethlehem employees who *were* allowed to transfer indicate not only that they were all younger than Tyler, but also that Bethlehem had a special category of employees known as "Young Tigers"—an evaluative category

from which a long-in-the-tooth employee like Tyler was by definition excluded.

This is not the stuff of a *McDonnell Douglas–Burdine* prima facie case. Tyler proved much more than mere qualification for and availability of the position; he proved, to the jury's apparent satisfaction, that age actually entered into Bethlehem's decisional processes. Tyler's proof consisted of more than "stray remarks", "statements by non-decisionmakers", and evidence "unrelated to the decisional process". *Compare Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring). If there is no "smoking gun" in Tyler's case, *cf. Lockhart*, 879 F.2d at 48, there is at the very least a thick cloud of smoke, which is certainly enough to require Bethlehem to "convince the factfinder that, despite the smoke, there is no fire." *Price Waterhouse*, 490 U.S. at 266, 109 S.Ct. at 1799 (O'Connor, J., concurring).

■ To summarize and to repeat: *Price Waterhouse* does not require, in a jury trial, "direct evidence" of discriminatory animus (at least not in the sense of "direct" and "circumstantial" evidence). What *is* required is simply that the plaintiff submit enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were "because of" an impermissible factor. Since the goal of a New York Human Rights Law (or an ADEA, or a title VII) claim is to determine whether an adverse employment decision was made "because of" an illegitimate factor, an instruction which allows the jury to determine (1) whether an illegitimate criterion was a substantial or motivating factor in an adverse employment decision, and (2) if so, whether the employer has met its burden of proving that the employment decision would have happened anyway, properly captures the import of the Human Rights Law (or ADEA, or title VII).

This is the best way to charge a jury when the ultimate issue is intentional discrimination; anything more complex would mire the court in the hopeless task of distinguishing "direct" from "circumstantial" evidence in addition to the already-complex task of determining discrimination. *See Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1138 (4th Cir. 1988). The jury here was properly instructed.

## B. *Weight of the Evidence*

■ Bethlehem next argues that the jury's verdict was against the "clear weight" of the evidence, and the judgment should simply be reversed. Unlike some state courts, we cannot review jury verdicts on this ground. We will, however, interpret this argument as a challenge to the sufficiency of the evidence, presented here by Judge Curtin's refusal to grant judgment n.o.v., *see* Fed.R.Civ.P. 50(b), and we reject it.

In reviewing the denial of a judgment n.o.v., our function is "essentially the same as the function of the trial court". *Schwimmer v. Sony Corp. of America*, 677 F.2d 946, 951–52 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). To reverse, we must be satisfied, without the benefit of credibility findings, that the evidence is so one-sided and contrary to the jury's verdict that there is only one reasonable conclusion as to the proper judgment. *Id.* at 952.

Bethlehem cites us to *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510 (6th Cir.1991), a sixth circuit case affirming a directed verdict for the defense in an ADEA case. Even were we bound by *Wilson*, this case is readily distinguished. In *Wilson*, the plaintiff's evidence consisted of the following: (1) a memo written by a Firestone vice-president at the time of Wilson's severance which made reference to "33 years of service"; (2) a 1986 conversation in which the plaintiff's supervisor expressed a general hope that older employees would take advantage of Firestone's early retirement program; and (3) personnel documents which indicated Wilson's

(and other employees') ages and length of service (and which were required to contain this information under EEOC regulations). *Id.* at 514. These facts are, to be sure, similar to our case, but in *Wilson* that is all there was; here, as our discussion, *supra*, regarding the jury instruction makes clear, much more was offered on Tyler's behalf, and if believed, it could reasonably lead to the conclusion that, because of his age, Tyler was discharged rather than transferred. We therefore affirm Judge Curtin's denial of judgment n.o.v.

### C. *Damages*

■ Bethlehem's third claim is that the $995,000 in damages was "unduly speculative, against the clear weight of the evidence, and based on speculative testimony of plaintiff's expert which should not have gone to the jury." Again, Bethlehem seems to have forgotten that a federal appellate court cannot reweigh the evidence after a trial. Again, we will reconstrue Bethlehem's argument into one cognizable by this federal court.

We see Bethlehem's challenge as two-pronged; *i.e.*, to Judge Curtin's refusal to strike the testimony of Tyler's expert economist, and to the amount of damages. Neither challenge is persuasive.

**1. Expert opinion.** Dr. James Holmes, an economist called by Tyler, testified on the amount of economic loss suffered by Tyler as a result of his termination. Bethlehem claims this testimony should have been excluded, stating that Holmes relied on two unfounded assumptions: (1) that Tyler would have continued working for Bethlehem for 17 years; and (2) that Tyler would have received annual salary increases of 8.3% had he continued working for Bethlehem.

Bethlehem's arguments are better addressed to a jury. Holmes derived the 17 year figure from an official government document, *Work Life Estimates, Effects of Race and Education*, published by the U.S. Department of Labor. Applying its data as to average work-life expectancies to Tyler, Holmes concluded that Tyler would have worked until the middle of his sixty-fifth year, or 17 years after his layoff. To determine how much Tyler would have earned during those 17 years, Holmes calculated the rate of increase in Tyler's wages over the past 17 years at an average of 8.3% per year. Holmes then projected the same 8.3% average increase to Tyler's hypothetical earnings for the 17 years from 1985 to 2002 and concluded that Tyler's maximum future lost earnings, discounted to present value, would be $915,105. The jury's award of $667,000 in future lost earnings fell well within this projection.

In support of its motion to strike Holmes' testimony, Bethlehem argued (1) that from 1986 to 1990, "virtually no Bethlehem salesman received a wage increase every year", (2) that the company's overall budget for wage increases ranged from a low of 2½% (1986–88) to a high of 5% (1989–90), and (3) that although "the highest paid Bethlehem salesman in Mr. Tyler's position at the time of trial was earning slightly in excess of $56,000", Holmes had projected Tyler's 1990 salary as $71,688.

Bethlehem's arguments do not address the admissibility of Holmes' testimony. Under Fed.R.Evid. 702, expert testimony is admissible if the witness is qualified as an expert by knowledge, skill, experience, training or education, and if the testimony will be helpful to the trier of fact. Under Fed.R.Evid. 703, expert testimony may be based on firsthand observation of the witness, on facts or data presented at the trial, or on facts and data presented before the trial. All of Bethlehem's arguments, however, go to the weight, not the admissibility, of the testimony. Judge Curtin did not abuse his discretion when he denied Bethlehem's motion to strike Holmes' testimony.

On this record it was for the jury to determine both the length of the work period denied to Tyler and the amount he would have earned during that period. As to the salary level and the rate of increases the jury could reasonably evaluate the

proper weight to give to historical rates, Tyler's own abilities, and the actual wage differences at the company between Tyler's discharge and the time of trial. We cannot say that an award of $667,000 against a maximum projection, discounted to present value, of $915,105, was arbitrary, unreasonable, or speculative.

■ Moreover, as to Bethlehem's evidence that the highest-paid Bethlehem salesman in 1990 made $56,000, it bears noting that a company which was purging its older, more experienced workers and replacing them with "young tigers" would naturally have a less-senior workforce with a lower average salary. Rather than requiring a new trial, this evidence may have helped to persuade the jury that Bethlehem was in fact purging its older, more experienced, and higher-paid salesmen—like Alvin Tyler.

■ **2. Speculative damages.** Relying on our decision in *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724 (2d Cir.1984), an ADEA case, Bethlehem argues that front pay awards for time periods longer than four years "necessarily involve speculation" and cannot be sustained on appeal. We disagree.

*Whittlesey* held that the enforcement provision of the ADEA, *see* 29 U.S.C. § 626(b), authorizes the district courts to grant an ADEA claimant "such legal or equitable relief as may be appropriate to effectuate the purposes of" the ADEA, a construct which includes front pay. *Whittlesey*, 742 F.2d at 727 (quoting 29 U.S.C. § 626(b)). Similarly, under New York's Human Rights Law, plaintiffs "have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate". N.Y.Exec.Law § 297(9) (McKinney Supp. 1992).

In *Whittlesey*, we held that the district court did not abuse its discretion in ordering front pay for a four-year period between the trial date and the date when compulsory retirement could be imposed.

We there affirmed the front pay award because it "did not require undue speculation, either as to the possibility of mitigation, or as to the amount he would have made at Union Carbide had he not been fired." *Id.* at 729.

Although front pay awards always involve some degree of speculation, we think that the jury's deliberations were well-cabined by the expert testimony of expected income, possible future earnings from other employment, and expected worklife. Here, the jury awarded Tyler, discounted to present value, $667,000 in front pay over a work life estimated by Dr. Holmes to be 17 years. This works out to an average of $39,235.29 per year. The undisputed evidence shows that Tyler made more than this amount in each year from 1980 to 1985, and his 1986 income, projected to a full year, would have been substantially higher as well. Such an award cannot possibly shock our conscience. This lower award may well be because of the expert's refreshing forthrightness: on *direct* examination, he specifically allowed for the possibility that Tyler would become employed again. In essence, he told the jury that if they believed Tyler would become employed the day after the trial, the expert's front pay estimate would drop to $327,210. In view of the fact that all money damage awards under New York's Human Rights Law are legal remedies, *compare Murphy v. American Home Prods. Corp.*, 136 A.D.2d 229, 231, 527 N.Y.S.2d 1, 2 (1st Dep't 1988) *with Whittlesey*, 742 F.2d at 728 (front pay under the ADEA is equitable relief), it was entirely proper for the jury—armed with extensive testimony about future earnings and chances of employment in the steel industry—to arrive at the damage award that it did.

We have reviewed and upheld this verdict under the traditional "shocks the conscience" standard that applies under federal law; however, there is a suggestion that our review should be circumscribed by the "deviates materially from what would be reasonable compensation" standard of

N.Y.Civ.Prac.L. & R. § 5501(c) (McKinney Supp.1992), which gives New York's appellate division somewhat greater latitude in reviewing the rationality of jury verdicts. *See* N.Y.Civ.Prac.L. & R. § 5501 (commentary by David D. Siegel) (McKinney Supp. 1992). This section by its very terms seems to apply *only* to the appellate division, but just as we did in *Gardner v. Federated Dep't Stores*, 907 F.2d 1348, 1353 n. 1 (2d Cir.1990), "we conclude that in the instant case the outcome would be the same under section 5501(c), [so] we need not express an opinion as to which standard applies"; we leave this interesting *Erie* question for still another day.

▪ Bethlehem also challenges the jury's awards of back pay and damages for emotional distress. While the jury's award of $310,000 in back pay was slightly higher than the plaintiff's expert's calculation of $266,106, it does not shock the conscience, nor does it deviate substantially from what would be reasonable compensation; thus, there is no basis for us to disturb that award.

▪ Similarly, the $18,000 awarded for emotional distress was extremely modest; it is neither conscience-shocking nor substantially deviant from reasonable compensation. Tyler testified that losing his job was "like a divorce, your wife died or state of shock." *Compare State Div. of Human Rights v. County of Onondaga Sheriff's Dep't*, 127 A.D.2d 986, 986–87, 513 N.Y.S.2d 68, 68 (4th Dep't 1987) (in a case under § 296(1)(a) of the Human Rights Law, mental anguish award reduced to $15,000 in 1987 dollars where complainant was "upset, depressed, felt demeaned and insecure and still experiences nightmares"), *aff'd without consideration of this point*, 71 N.Y.2d 623, 528 N.Y.S.2d 802, 524 N.E.2d 123 (1988).

### D. *Front Pay*

▪ Bethlehem claims that the issue of front pay should not have been submitted to the jury, but should have been decided by the court. Although we have noted, *supra*, that money damages under the Human Rights Law are a legal remedy, we need not reach this issue since Judge Curtin, in deciding both parties' post-trial motions, stated: "If frontpay should be decided by the court, I will consider the jury's verdict as an advisory one and adopt the jury's verdict on frontpay as the court's." Since Judge Curtin unequivocally indicated that he would make the same front pay award himself, it is clear that the alleged error, if any, "does not affect the substantial rights of the parties", Fed.R.Civ.P. 61, and would be harmless.

### E. *Punitive Damages*

▪ On his cross-appeal, Tyler challenges Judge Curtin's refusal to send his punitive damages claim to the jury. Citing *Thoreson v. Penthouse International, Ltd.*, 149 Misc.2d 150, 563 N.Y.S.2d 968 (Sup.Ct., N.Y.Cty.1990), and *Seitzman v. Hudson River Associates*, 143 Misc.2d 1068, 542 N.Y.S.2d 104 (Sup.Ct., N.Y. Cty. 1989), Tyler argues that the New York courts have concluded that punitive damages are recoverable in an action commenced under § 297(9) of New York's Human Rights Law.

Our task is to determine what the pertinent New York law is and how to apply it to this case. Obviously, "the State's highest court is the best authority on its own law", *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967), but we are without guidance from the New York Court of Appeals. We do not even have the benefit of an appellate division decision. The guidance we do have consists of two state trial court opinions (one of which, *Thoreson*, is *sub judice* in New York's appellate division). We are certainly not bound by these two rulings; we need only give them their "proper regard". *Estate of Bosch*, 387 U.S. at 464–65, 87 S.Ct. at 1782.

In the absence of any New York appellate decision construing § 297(9) in the con-

text of punitive damages, it is entirely proper for us to exercise our own judgment in construing it. 1A James William Moore, *Moore's Federal Practice* ¶ 0.307[2], at 3066–67 (2d ed. 1991). In so doing, we conclude that the New York Court of Appeals, if faced with the question, would conclude that punitive damages are not available. In reaching this conclusion, we are informed by the excellent analysis of Judge Goettel in *Conan v. Equitable Capital Mgmt. Corp.,* 774 F.Supp. 209 (S.D.N.Y. 1991):

> New York's Human Rights Law was amended in 1968 to create a private cause of action. In a statement of their intent, the drafters of the amendment emphasized that the individual subjected to a discriminatory practice should have a right to go to court seeking damages *caused* by discriminatory practices or other appropriate relief. Governor's Committee, *Report to Governor Nelson A. Rockefeller,* at 41 (1968) (emphasis added). Punitive damages, however, are designed to deter conduct and not to award damages for injuries caused by the conduct. It follows, therefore, that punitive damage awards were not contemplated by the New York legislature.

> This construction is buttressed by the fact that in 1982 the New York State Assembly Committee on Human Rights recommended that the state court should be empowered to award exemplary damages in human rights cases. *In Pursuit of Justice,* Report of the N.Y. State Assembly Subcommittee on Human Rights, at 10 (March 25, 1982). This report referred to a pending bill which would have enacted such a change. However, that bill was never adopted. This confirms that the Legislature did not consider punitive damages to be available under the Human Rights Law.

> An additional consideration is the fact that the New York procedures were originally geared toward encouraging administrative action. Since it is clear that punitive damages can not be obtained administratively, *see Cullen v. Nassau County Civil Service Commission,* 53 N.Y.2d 492, 442 N.Y.S.2d 470, 425 N.E.2d 858 (1981), the effect of allowing such an award in court would be to discourage the very type of administrative procedures that the New York State Legislature sought to encourage.

> A corollary consideration is the fact that punitive damages are not available under the equivalent federal statutes, namely, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* or the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* The federal courts are already confronted with pendent state claims in many employment discrimination cases because the state statutes already permit a broader range of damages than are available under the federal statutes. If we add punitive damages to that list under state law, the incentive for adding pendent state claims is greatly increased. In addition, recourse to the federal statutes will become highly unattractive except as a device to create federal jurisdiction.

*Conan,* 774 F.Supp. at 211. We see nothing to add to Judge Goettel's pellucid reasoning and adopt it as our own. In sum, Judge Curtin properly refused to permit the jury to consider punitive damages.

## CONCLUSION

The judgment of the district court is affirmed.