**Francis T. BARTH, Plaintiff,**

v.

**CBIS FEDERAL, INC., Defendant.**

**No. CV 92–2415.**

United States District Court,
E.D. New York.

April 20, 1994.

Patrick H. Barth, New York City, for plaintiff.

Gibson, Dunn & Crutcher by Mary P. Donlevy, New York City, for defendant.

*MEMORANDUM AND ORDER*

WEXLER, District Judge

Plaintiff Francis T. Barth brings this action alleging that his former employer defendant CBIS Federal Inc. ("CBIS Federal") discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and New York's Human Rights Law ("HRL"), N.Y.Exec.Law §§ 290 *et seq.* In addition, plaintiff brings a claim for breach of employment agreement based on diversity jurisdiction.[1] Presently before this Court is defendant's motion for summary judgment seeking to dismiss all of plaintiff's claims. For the reasons below, defendant's motion is granted.

## I. *BACKGROUND*

For purposes of this motion, the evidence can be summarized briefly as follows. In February of 1986, plaintiff was hired by Vanguard Technologies Corp. ("Vanguard"), the predecessor of CBIS Federal, to work on a task order (service contract) Vanguard had with the Internal Revenue Service ("IRS"). Plaintiff executed a written employment agreement with Vanguard. At the time, plaintiff was 43 years old. In mid–1988, Vanguard was acquired by the parent of CBIS Federal, Cincinnati Bell Information Systems, Inc. ("CBIS"). Vanguard subsequently changed its name to CBIS Federal Inc., and plaintiff continued as an employee of CBIS Federal.

Under its task order with the IRS, Vanguard provided two telecommunication technicians at each of ten different locations throughout the United States. Plaintiff was employed at the Brookhaven Service Center, which was near his home on Long Island, along with a younger technician. Other technicians were hired in other cities to serve as technicians at the IRS Service Centers in their areas. When the work on this contract was completed, the company laid off all the technicians, except for plaintiff.

Defendant, by its Director of Human Resources, Donald M. Laing ("Laing"), asserts that such layoffs are not uncommon since the company generally fills full-time positions on its various government service contracts by hiring from the local work force, and then, when the work on a particular contract or task order is completed, the company lays off the workers at the site rather than transfer them to another geographic location. Defendant claims that, although it is rare, the company has staffed work on contracts with employees from other geographic locations, but that this has occurred only in limited circumstances. Such circumstances exist where the location was remote and no qualified employees existed at the geographic location of the work, where the company already employed a worker uniquely qualified for a specific task and the employee was able to relocate, or where the company bid contracts that allowed for existing employees to travel at government expense to remote sites for temporary assignments and it would not make sense to hire from the local workforce for such assignment. Defendant further explains that it is not unusual for the company to lay off hundreds of employees at locations where work is ending while hiring hundreds of employees at other geographic locations where work is beginning. Declaration of Donald M. Laing ("Laing Decl."), ¶¶ 4–5.

In September 1989, CBIS–NT, an affiliate of CBIS Federal, obtained task orders (fixed price contracts) with the IRS. CBIS Federal, as an inter-company subcontractor of CBIS–NT, provided various automated data processing services to the IRS pursuant to these task orders. Pursuant to proposals submitted by CBIS Federal to the IRS, CBIS Federal agreed to provide developmental maintenance of a data communications system and data communications assistance at, among other places, an IRS Service Center in Andover, Massachusetts (the "Andover Contract"). Under the Andover Contract, CBIS Federal was required to deliver a variety of services, including software design, programming, systems documentation and help desk type support, and a single on-site "Telecommunication Specialist." Plaintiff was assigned to work full time as the

---

1. Plaintiff also asserted that defendant discriminated against him based on a hearing disability, but withdrew that claim in response to defendant's motion.

"Telecommunication Specialist" at Andover. The price proposal for the task order included funding to support plaintiff's travel between his home on Long Island and the IRS Service Center in Andover on a weekly basis. He was the only CBIS Federal employee assigned to work full time on this task order at Andover.

Around April or May of 1990, CBIS Federal's then-Program Manager, Susan Hunt ("Hunt"), determined that CBIS Federal would lose money on the Andover Contract if it continued to provide plaintiff's services under the Andover Contract, in addition to the other services required under the contract. Hunt states that she determined that the scope of the design, programming and documentation that the IRS wanted exceeded that anticipated when the task was bid, and the requirements for plaintiff's work in Andover decreased and were less than anticipated. Declaration of Susan Hunt ("Hunt Decl."), ¶ 5. In May 1990, Hunt proposed to the IRS that CBIS Federal increase the design, programming and documentation services and eliminate plaintiff's services. Hunt Decl. ¶ 6. She asserts that plaintiff's age had nothing to do with her decision to eliminate his job. Hunt Decl. ¶ 8. Thereafter, defendant received oral approval from the IRS to eliminate plaintiff's job from the Andover Contract. The defendant and the IRS entered an amended task order in August 1990, reflecting elimination of plaintiff's job.

Because Hunt had no need for a telecommunications or data communications specialist on any other task order she managed, she referred plaintiff's name to CBIS Federal's Human Resources function. Hunt Decl. ¶ 7. As CBIS Federal's then-Manager of Human Resources, Laing concluded that there were no openings in plaintiff's geographic location nor elsewhere that would justify relocating plaintiff, and plaintiff did not possess unique skills needed on another project. Laing Decl. ¶ 11. As a result, plaintiff was laid off. Plaintiff was advised of his termination by letter dated May 21, 1990 (the "May 21 Termination Letter"). He was 48 years old at that time. Plaintiff purportedly was one of 135 employees laid off by the company during the period from March 1, 1990 through September 30, 1990, and none was offered the opportunity to relocate to accept a job in another city. Laing Decl. ¶ 12.

Plaintiff contends that the real reason for his discharge was not a "funding issue," but to enable defendant to restructure hours on the Andover Contract in favor of younger employees. Plaintiff maintains that certain of the functions previously performed by him on the Andover Contract were, after his termination, allocated to two project managers—Hunt and John Shields, plaintiff's immediate supervisor—and a research analyst, Carolyn Andrews. At the time plaintiff was terminated, Hunt was 44 years old, Shields was 39 years old, and Andrews was 37 years old. Plaintiff argues that "[a]n employer cannot be allowed to discharge a protected person, reallocate the work load and argue that a position was eliminated to defeat the case." Plaintiff's Memorandum of Law ("Pl. Mem."), at 12.

Plaintiff relies primarily on a comparison of the original Andover proposal of September 1989, originally accepted by the IRS and the amended proposal of August 1990, later accepted by the IRS. Plaintiff contends that a comparison of these proposals demonstrates that while the Telecommunication Specialist's hours were reduced from 2460 hours to 1236 hours (a total of 1224 hours), the project managers and the research analyst were reallocated an additional 390 hours and 1035 hours, respectively. Plaintiff focuses on the change in hours for the service identified as "SAT Testing"—elimination of 220 hours for the Telecommunication Specialist, and increases of 147 hours for the project leader, 200 hours for the research analyst, and 94 hours for the renowned expert—and claims that this "reallocation pattern exists through the contract." Declaration of Plaintiff Francis T. Barth ("Barth Decl."), at ¶ 14.

According to defendant, a comparison of the September 1989 and August 1990 proposals demonstrates, however, that only 269 of the 1224 hours eliminated from the hours originally contemplated for plaintiff in the Andover Contract went to increase the proposed hours of other CBIS Federal employees. *See* Supplemental Declaration of Susan Hunt ("Hunt Supp.Decl."), ¶ 6 & Ex.D. Of

these 269 hours, 220 hours were the hours eliminated from the Telecommunication Specialist for the "SAT Testing." Thus, contrary to plaintiff's contention, there is no "pattern" of reallocation throughout the contract. According to defendant, the August 1990 proposal reflects that the hours proposed for the Telecommunication Specialist were reduced beginning in June 1990 and reduced to zero beginning in July 1990. Although defendant admits that a "very small portion" of work initially assigned to plaintiff may have been performed by Hunt and Shields, defendant offers time records and summaries indicating that after plaintiff's termination Hunt and Shields did not experience any material increase in actual hours worked on the Andover Contract. In addition, these records show that Andrews performed little work at all on the Andover Contract after plaintiff's termination. Rather, Gerry Goodale was the research analyst with the greatest number of hours on the Andover contract after plaintiff's termination. Goodale was approximately 43 years old at the time plaintiff was terminated. Defendant maintains that any meaningful portion of the work initially assigned to plaintiff under the Andover Contract that remained after he was laid off would have been performed by John Slupski, a consultant who worked for a subcontractor of CBIS Federal. Hunt Supp.Decl. ¶ 5. Slupski is slightly older than plaintiff. This contention is supported by the August 1990 proposal, which indicates that the majority of hours eliminated from the Telecommunication Specialist position were allocated to the "Renowned Expert." The Renowned Expert was the consultant, Slupski.

Plaintiff alleges as further evidence of age discrimination: (1) that Shields' predecessor, James Hobson, and a supervisor named James Kline, referred to plaintiff as the "senior man"; (2) that Shields wrote in a memorandum that plaintiff "brought much *maturity* and technical support to the EFS effort"; and (3) that Shields told plaintiff that plaintiff was "making too much money." When viewed in context, none of these statements reflects age discrimination. Plaintiff admitted in his deposition that Hobson and Kline used the term "senior man" to communicate that plaintiff was the person with the greatest experience or skills. As for Shields' reference to plaintiff's "maturity," this memorandum was written in support of a bonus for plaintiff praising plaintiff's performance. Lastly, Shields made the statement that plaintiff was "making too much money" in explaining to plaintiff that although the company was satisfied with plaintiff's performance, his raise could not be higher than a certain amount computed on the basis of plaintiff's salary.

Plaintiff further claims that his termination was in breach of his employment agreement with defendant. Defendant maintains, however, that plaintiff's employment was "at will," and therefore his termination was not in breach of the employment agreement.

## II. *DISCUSSION*

A party seeking summary judgment must demonstrate that "there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Where the non-moving party, as here, bears the ultimate burden of proof at trial that the defendant discriminated, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), he may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir.1992). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1363, 89 L.Ed.2d 538 (1986). In ruling on the motion, this Court is mindful that it is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and that summary judgment is ordinarily inappropriate where intent and state of mind are at issue. *See Montana v. First Federal Savings & Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir.1989).

## A. *Age Discrimination Claims*

The ADEA prohibits an employer from discriminating against an employee on the basis of the employee's age, and protects employees who are at least 40 years old. 29 U.S.C. §§ 623, 631(a). Plaintiff's ADEA claim is governed by the burden-shifting analysis of *Burdine, supra*, and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq., see Maresco*, 964 F.2d at 110; *Montana*, 869 F.2d at 103–06.

Under this analysis, plaintiff has the initial burden to establish a prima facie case of age discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. To establish a prima facie case of unlawful discharge, plaintiff must establish that (1) he was a member of the protected age group; (2) he was qualified for the position to which he claims entitlement; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. *Maresco*, 964 F.2d at 110. If plaintiff satisfies this burden, defendant must then articulate a legitimate, nondiscriminatory reason for the challenged employment decision. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Should the defendant meet this burden of production, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* However, as the Supreme Court recently stated, "a reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original).

As for plaintiff's discrimination claim based on New York's Human Rights Law, N.Y.Exec.Law §§ 290–301, the elements of proof of liability are the same as those required under plaintiff's ADEA claim. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

For purposes of this motion, defendant does not dispute that plaintiff will be able to present sufficient evidence to satisfy the first three elements of his prima facie case. However, as to the fourth element, defendant maintains that plaintiff cannot present sufficient evidence to warrant a trial. Plaintiff argues that the circumstances of his discharge raise a permissible inference of age discrimination. Based on a review of the evidence submitted, this Court disagrees.

Although some of the responsibilities plaintiff was initially assigned to perform on the Andover Contract were absorbed by other CBIS Federal employees, none of these other employees was given any significant portion of the responsibilities of plaintiff, the jobs of these other employees apparently remained essentially the same and there is no evidence to suggest otherwise, no one was hired to replace plaintiff, and the number of hours for the Telecommunication Specialist position was reduced to zero shortly after his termination. This Court recognizes that an inference of age discrimination can exist even when a "replacement employee" and the discharged employee are members of the protected group, 'but the smaller the difference in age the weaker the inference of discrimination. *See, e.g., Wolfe v. Time, Inc.*, 702 F.Supp. 1045, 1049 (S.D.N.Y.1989). The age difference between plaintiff and Hunt or Goodale was less than five years. Clearly no inference of age discrimination arises given such a small difference in age, particularly considering that these other employees were not replacement employees, were not given any significant portion of the responsibilities of the discharged employee, and remained in essentially their same positions while plaintiff's position was eliminated. Consequently, a reasonable fact-finder could not infer that plaintiff was discharged in favor of the younger employees.

The facts in *Montana, supra*, relied on by plaintiff, are distinguishable. In *Montana*, the Second Circuit found an inference of discrimination existed in an employer's discharge of a 56 year old employee where the majority of that employee's responsibilities were not eliminated, but transferred to a 26

year old overworked coworker, followed shortly thereafter by the transfer of some of the coworker's responsibilities to another 26 year old employee. Thus, not only was there a 30 year difference in the age of the employees, but a majority of the older employee's responsibilities were transferred to the younger employee and not eliminated.

Nor was defendant's failure to relocate plaintiff to a position in another location evidence of age discrimination. The evidence indicates that of the 135 persons laid off during the six month period from March to September 1990, none was offered relocation and 124 were younger than plaintiff. Moreover, plaintiff offers no evidence that defendant's policy against relocating employees (except in limited circumstances) was applied in a way that discriminated on the basis of age, and offers only one possible instance in which defendant did not adhere to its policy against relocating employees. Ironically, this one instance was the relocation of plaintiff prior to the Andover Contract.[2]

█ Because plaintiff has failed to establish a triable issue of fact that his discharge occurred under circumstances giving rise to an inference of age discrimination, his ADEA and HRL claims must be dismissed.[3]

B. *Breach of Employment Agreement*

█ Defendant contends that plaintiff's employment was pursuant to a written agreement providing that employment was "at will," and therefore his termination was not in breach of the employment agreement. Plaintiff, on the other hand, argues that the "employment contract [was] of indefinite duration with specific conditions for discharge and re-employment" that were breached by

defendant. Pl.Mem. at 3. Plaintiff relies on language in the written agreement that plaintiff's employment is " 'at will,' and subject to the Company's procedures and policies regarding its employees, including the Company's right to terminate employment." Barth Decl. at Ex. B.

According to plaintiff, defendant breached the employment agreement by failing to try to locate a position for him with "similar skill and salary requirements," as required by defendant's procedures and policies regarding termination of employment which is reflected in defendant's "Corporate Policy and Procedure," entitled "Termination of Employment" (*see* Laing Decl., Ex. A). In addition, plaintiff maintains that defendant assured plaintiff continued employment until March 16, 1991 (based on plaintiff's March 1990 annual performance review indicating that his next annual performance review would be held March 16, 1991 and that his employment goals could be met by then) or, in the alternative, until at least September 30, 1990, the original expiration of the Andover Contract. A review of the record demonstrates that plaintiff's claim cannot stand.

The evidence in the record is not sufficient to support a finding that defendant promised, explicitly or implicitly, to employ plaintiff until the end of the Andover Contract, originally contemplated as September 1990. Nor is there sufficient evidence to establish a promise to employ plaintiff until March 16, 1991. The March 1990 performance review does not support such a claim. The indication that plaintiff could meet his employment goals in the future was an assessment by Shields of plaintiff's ability to meet self-described "personal goals" during the upcoming

---

**2.** In this respect, plaintiff states that in late Summer/early Fall 1988, he left the Brookhaven Service Center to do further work for the IRS involving the "IBM Series 1 Processor," a system new to him. He claims the company provided him training in this system since he was not "uniquely qualified" for the position. He travelled to IRS centers in Ohio and Utah, and eventually was assigned to the Andover Contract to work on the IBM Series 1 Processor.

**3.** Moreover, plaintiff fails to introduce sufficient evidence to raise a triable issue of fact that defendant's legitimate, nondiscriminatory reason

for discharging plaintiff, *i.e.*, a funding issue, was a pretext for age discrimination. Plaintiff speculates that no funding issue could have existed. For example, plaintiff states that the IRS had requested an extension of the contract and no one suggested that the IRS would not pay for plaintiff's services. However, defendant does not contend that the IRS would not pay for plaintiff's services but that, to meet the IRS's desires, defendant decided to eliminate plaintiff's position and allocate greater resources toward other aspects of the project, *i.e.*, software development, a solution the IRS accepted.

review period. Given the absence of other evidence of a promise of continued employment, these remarks in plaintiff's annual review do not establish a promise to employ plaintiff during that period.

As for plaintiff's argument that his termination was wrongful because it contravened defendant's termination policy guide,[4] there is nothing in the guide which entitles plaintiff to continued employment. The guide does state that in the event of "Involuntary Termination—Layoff," defendant's Office of Administration will investigate employment opportunities elsewhere in Vanguard. However, considered in the totality of the circumstances presented, this general policy on termination does not require defendant to locate a position for plaintiff of "similar skill and salary requirements" as an "express limitation" on defendant's right to terminate plaintiff. *See Gmora v. State Farm Mutual Ins. Co.*, 709 F.Supp. 337 (E.D.N.Y. 1989) (applying New York law).

### CONCLUSION

For the reasons above, defendant's motion for summary judgment is granted, and the complaint is dismissed. The Clerk of the Court is directed to close the file in this case.

SO ORDERED.

---

4. Although defendant claims that this policy guide was intended for supervisors only, it admits, without further explanation, that a copy was provided to plaintiff "as he was the only full time CBIS Federal employee on site at Andover."

Laing Decl. ¶ 10. Further, although defendant disputes that plaintiff relied on the guide, this Court will assume for purposes of this motion that plaintiff did rely on the guide.