**Phyllis CROCE, Plaintiff,**

v.

**VIP REAL ESTATE, INC., Defendant.**

**CV 89–2121 (ADS).**

United States District Court,
E.D. New York.

Jan. 13, 1997.

Loren Baily, Brooklyn, NY, for Plaintiff.

Russo, Fusco, Scamardella & D'Amato, P.C. Staten Island, NY (Thomas J. Russo, Ann Marie Henderson, of counsel), for Defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This is a gender discrimination case, brought under pre–1991 Title VII of the Civil Rights Act of 1964. The plaintiff, a former Manager and Director of Recruitment and Training of the defendant real estate brokerage company, contends that she was discriminated against, denied promotion to the position of General Manager, and discharged because she is a woman.

## BACKGROUND—SUMMARY OF EVENTS

The plaintiff Phyllis Croce (the "plaintiff" or "Croce"), a licensed real estate agent, was first employed by the defendant VIP Real Estate, Inc. (the "defendant" or "VIP") in or about September 1982 as a real estate salesperson. VIP is a real estate brokerage company in the business of selling real estate and is located in Staten Island. Henry Picciurro is, and was at all relevant times, the President and sole shareholder of VIP.

In or about 1983, the plaintiff was promoted to the position of Manager of Residential Sales at the defendant's Clove Road office, which, at that time, was the only VIP office. The duties of an Officer Manager were to assist in hiring salespersons, helping salespersons to list and negotiate sales and to pursue a sale from contract to closing.

In 1984, VIP opened a second office for residential sales on Victory Boulevard in Staten Island. In or about 1984, the plaintiff assumed the additional duties of recruiting and training salespersons for both the Clove Road and Victory Boulevard offices in addition to her duties as Manager of the Clove Road office. Also in 1984, plaintiff was made the Director of Recruitment and Training. In 1985, the defendant opened a third office for residential sales on Hylan Boulevard, Staten Island. In 1985, the plaintiff was promoted to the position of Director of Personnel and Training. The duties of the latter position were to recruit new salespersons; conduct training sessions to train new salespeople; assign new salespersons to the various offices; hire secretarial and clerical staff; recommend hiring of office managers; advertise, plan and conduct Career Nights; oversee the sales of new salespeople and help them to get listings and create sales. In 1986, the defendant opened a fourth office for residential sales on Forest Avenue in Staten Island. At that time, the plaintiff was assigned the responsibility of recruitment and training for the four offices of VIP.

On October 21, 1987, the plaintiff's employment ceased. There is a dispute as to whether the plaintiff voluntarily resigned or was terminated by Picciurro.

### THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

Phyllis Croce had years of experience in the real estate sales field. Prior to and at all the times at issue she was a licensed real estate salesperson. In September 1982 Croce commenced employment with VIP as a residential salesperson in the Clove Road office, at that time the only VIP office. One Lenny D'Orazio was then the Office Manager. VIP opened a second office on Victory Boulevard in April–May 1983. At that time, Kathy Hartman was the Office Manager of the Victory Boulevard office and Irene Orsini was the Office Manager of the Clove Road office. In 1983 the plaintiff was promoted to Office Manager of the Clove Road office.

In 1984, Picciurro asked Croce to assume the additional duties of recruiting and training the salespersons for both the Clove Road and Victory Boulevard offices. In January 1985, Croce was promoted to the position of Director of Personnel and Training, while still managing the Clove Road office. In that position, Croce directed a ten-week course for salespersons involving training in multiple listing, mortgage and Fair Housing requirements, among other real estate matters. She also conducted "career seminars," placed ads in local papers to recruit new salespersons and generally oversaw their transition from training to actual selling.

During the early and mid–1980s the real estate market flourished. Responding to this rise in the market, VIP opened a third office on Hylan Boulevard in 1985 and a fourth office on Forest Avenue in 1986. These four residential sales offices each had an Office Manager. In addition to these residential sales offices, VIP had a commercial real estate division, which was separate and apart from the residential sales division and was operated by Picciurro.

In 1985, Croce was promoted by Picciurro to the position of Director of Personnel and Training. She gave up her position of Office Manager of the Clove Road office in January 1986 to devote herself full time to the Personnel and Training position. The new Office Manager for Clove Road was Susan Levoyer. At that time Croce's office was on the third floor of the Clove Road establishment. When Croce assumed the full-time position of Director of Personnel and Training she received a base salary of $20,000 per year, and gave up her override on the salesperson's commissions that she received as an Office Manager. During this period there were 20 to 30 salespersons in the organization. Most of them were women. At no time during her employment did Croce have a written employment agreement with VIP. During all the time of her employment with VIP, Picciurro did all the firing. No one else fired anyone.

Throughout this period of major growth in the real estate field, Croce was Picciurro's "right hand man." Picciurro consulted Croce with regard to naming the managers of the offices. For several years prior to 1986 VIP had no General Manager. Picciurro was heavily involved with the commercial real estate division, and, with the opening of four offices, decided that a General Manager with overall supervision of the offices, was required.

The parties agree that Croce wanted to be the General Manager and Picciurro discussed the position of General Manager with her. Croce testified to a crucial conversation with Picciurro with regard to the position of General Manager. According to Croce, Picciurro told her that he knew she could do the job, but he would not promote her to General Manager because she was a woman:

Q And what, if anything, did Hank Picciurro say to you with respect to your qualifications for the position of general manager?

A He told me I knew better than anyone else how to do it. I had been doing it for three years.

Q And what was his reaction to him giving you the job?

A He wanted me to do the work but not the title, nor was he going to give me the pay.

. . . .

Q What did you and Mr. Picciurro discuss with respect to your qualifications as a general manager?

A He had discussed with me—I was very well aware of the fact that Hank did not want a woman as a manager—

MR. RUSSO: Objection.

THE COURT: Strike out the last statement.

A Hank said to me on various occasions he did not want a woman to run, to be the general manager. He considered women too emotional.

. . . .

Q Did he say anything else with respect to having a woman as a general manager?

A Only that he felt that both men and women prefer to work for men, that was his observation.

Q And can you tell me when he addressed those sentiments to you?

A Many times. He expressed it after Lenny D'Orazio left and I spoke to him about getting the position. This was a known fact. This is how he felt.

(Tr. at 74–76) *

In addition, Croce testified as to the following conversations with Picciurro relating to the same subject—his view of the roles of males and females in his real estate company:

Q Did you have a conversation with Picciurro concerning the position of director of personnel and training?

A Yes.

Q And is that what he said at that conversation?

A At that conversation he said I know you can do it. But he wanted me to concentrate in (sic) having men in these positions.

At the time we had mostly women in the company. He wanted me to bring more men into the company. And he wanted me to train them to become managers. At the time we had mostly all women managers.

Q What words, if you recall, did Mr. Picciurro use, to express what you just said?

A He said women are very emotional. I want a man—both men and women prefer to work for a man.

Q Those are the words he used?

A He used those words very often.

Q And did Mr. Picciurro—in the conversation of the director of personnel and training position, in giving you that position, did he say anything about you?

A He said, Phyllis, I know you can do it, I don't have to tell you, to tell you things, the one thing I like about it. I say to get it done, you roll and get it done. He tells me to prepare a presentation, or a slide preparation, he doesn't—for the career night for example.

He never told me specifically I want—this is what to do. He could count on me, and he told me often, he could count on me to get the job being done.

Q You testified earlier—

MS. BAILY: Your Honor, the transcript at 75, lines four through six.

Quote, Hank said to me on various occasions, he did not want a woman to run—to be the general manager. He considered women too emotional, unquote.

Later on page 76, lines 6 through 7 you said, quote, both men and women prefer to work for men, unquote.

Q What was Mr. Picciurro's demeanor when he said these things?

A He was very serious. He was responding to my question to him, that I am taking on all the responsibility of the general management. I am doing everything a general manager would do without pay, and without the title. That was his re-

---

* Tr. refers to the trial transcript.

sponse to me. *I want a man to run the company.*

. . . .

Q Do you recall when in '86?

A Prior to—probably sometime in July.

Q Do you recall that conversation?

A I had said to him, I am not going to take on all this responsibility any more.

He tried to, you know, calm me down and say, no, you should do it. I know you can do it. You have been doing it up to now.

I told him without the title and without the salary, there is no purpose in me doing this.

So, I told him at that point in time the only thing I will be involved with is to run the career nights and the awards nights, until he finds the man he is looking for.

Q In that conversation did Mr. Picciurro say anything about women holding the general manager's position?

A Again, he indicated, Phyllis, if I was going to hire a women it would be you. But they are much too emotional. They do not think like a man. And they do not have a business mind. And both women and men prefer to work for a man.

Q After that conversation did Mr. Picciurro take steps to hire a general manager?

A He did. He went to a search firm then. And he did hire.

. . . .

Q Did you have a conversation with Mr. Picciurro after he went to the search firm about the candidates for the general manager position?

A Yes.

Q And when does that conversation take place?

A He had called me into his office, and he said he thinks he had decided—

MR. RUSSO: Can we have the time, please?

THE COURT: Yes.

Q Ms. Croce, can you identify at least what year this was?

A Probably the end of July, the first week in August of '86, he called me into his office to explain—he said, you know, I think I found the right candidate for the job. His name is Carmen Mastrangelo. I think you too (sic) will work very well together, he is a very nice guy.

And I took that opportunity to ask him if any women candidates had applied for the position.

Q What did he say?

A He said, Phyllis, it wouldn't matter because I wouldn't hire a woman anyway. You know that. If I was going to hire a woman it would have been you. However—then he just mentioned that this Carmen Mastrangelo is a nice guy and we can work together.

(Tr. at 131–132, 137–139).

Croce testified that Picciurro expressed this sentiment many times and on various occasions. Croce said this was a "known fact" as to how he felt about a woman being the General Manager. The plaintiff was never promoted to the position of General Manager.

Milton Gutman, another VIP employee, testified about a meeting with Picciurro and Carmen Mastrangelo, the General Manager:

Q And was there ever a meeting that you had with Mr. Picciurro where he mentioned any preference for one gender or another to hold any position in the company?

A I remember the meeting very well. I was thinking about it when I was sitting in the room before.

Carmine (sic) was there, I was there and Hank. We were supposed to go out to dinner because I was getting the promotion.

MR. RUSSO: I will ask that it all be stricken, Judge. It's not responsive.

THE COURT: Motion denied.

Go ahead.

. . . .

THE COURT: Well, yes. I will strike that out.

Now, can you tell us what he said in words or substance? What did he say?

THE WITNESS: I remember it—the way I remember it, okay, because it has been a while, that he would feel a lot more comfortable working with a man rather than someone of the opposite gender—instead of a woman.

(Tr. at 845–844).

Also, Michael Liang, a VIP employee from 1984 to 1991, testified at length concerning Picciurro's bias against women:

Q And did you ever hear Mr. Picciurro in those conversations say anything about the sex of his employees?

A As far as to what, Counsel?

Q Did you ever hear Mr. Picciurro express a preference for men or women in any particular job category at VIP?

A Well, yes.

. . . .

THE COURT: Well, what year?

THE WITNESS: It would be in the '86, '87—but you see if what—if you're saying—if he has ever made, if Mr. Picciurro ever made any comments about anything to do gender-related, I would have to say often and it wasn't just one time.

BY MS. BAILY:

Q And limiting your testimony to the time period 1984 to 1987, what did you hear Mr. Picciurro say with reference to the gender of any of his employees?

A Well, I often heard Mr. Picciurro complain about the fact that he was constantly harassed and irritated by these women who would constantly badger him and complain about petty things that women complain about, jealousy. One manager in an office getting some advantage over another, as an example.

. . . .

Q Do you know who Mr. Picciurro was referring to in those statements.

A He was referring to the office managers.

. . . .

Q And what did you hear Mr. Picciurro say?

A Mr. Picciurro told me that he would never ever hire a woman as a general manager.

(Tr. at 861–864).

In September 1986, a male, Carmen Mastrangelo was hired as the VIP General Manager at a salary of $50,000 per year plus an override. According to Croce, after Mastrangelo arrived, he took over all her responsibilities except as Director of Personnel and Training. The parties stipulated that if John Mulvey of Human Resources International, Inc. were called as a witness he would testify that he sent four candidates to Picciurro, three men and one woman. After this appointment, Croce no longer reported directly to Picciurro. She and the Office Managers reported to Mastrangelo. In early 1987, VIP continued to operate four offices. Three of the offices were managed by women, namely, Geraldine Apollonio at Hylan Boulevard, Susan Levoyer at Clove Road, and Madelyne Pearlman at Forest Avenue. At the Victory Boulevard office Johanna Lattinelli resigned and was succeeded by Milton Gutman.

On April 18, 1987, Picciurro terminated Mastrangelo as General Manager. At that time, Picciurro told Croce that he was dissatisfied with Mastrangelo since he was a "memo man" and not the "roll up your sleeve" type of manager. At that time Croce again discussed her own desire to be General Manager. She told Picciurro that she "knew how he felt about having a woman as General Manager" and suggested that a male be given the title but she would do the duties. This arrangement did not occur.

On June 15, 1987, Picciurro promoted Sales Agent Stephen Wakschal to the position of General Manager. Other than his work as a sales agent for VIP, Wakschal had no prior real estate experience. At that time, according to Croce, Picciurro told her "I want you here for the next ten years." Croce was "humiliated" when Wakschal was promoted to General Manager because she hired and trained him as a sales agent and he had not even been an Office Manager. She

told Picciurro that she did not think Wakschal was qualified.

After Wakschal's appointment, Croce felt that he was isolating her from the firm's management. She did not attend any office Manager Meetings and was restricted from doing the advertising. Although Wakschal gave her a new title of Director of Recruitment and Training, Croce stated that he was indifferent to her and rarely spoke to her. Interestingly, Croce stated that she did not trust Wakschal and, apparently, typically for her, told him so. Croce also believed that Wakschal gave an award to the wrong person. Croce thought that he gave a $2500 award to a woman with whom he had a relationship. Again, typically for her, Croce told Wakschal of her view of the matter, and he denied her assertions. Not satisfied, Croce went to Picciurro and told him that she believed Wakschal forged certain listing agreements to show that his candidate merited the award. Picciurro responded that "If I ever question his (Wakschal's) ethics again, I'll fire you." However, ultimately, the award was apparently taken away from Wakschal and given to the candidate preferred by Croce.

On October 21, 1987, the plaintiff separated from her employment at VIP. The circumstances surrounding this "separation" are in dispute. The plaintiff claims that she was discharged while the defendant contends that she voluntarily left. Croce testified that she was discharged at a meeting with Picciurro, Wakschal and Jim Day. At that time, Picciurro told her that she had a problem getting along with Wakschal, she gave an award to the wrong person, she was destroying the morale of the company and "I think it is now time to sever this relationship." Her testimony in this regard follows:

Q Was this a calm, tranquil reaction by you at that time?

A Yes. I was somewhat upset, but I was calm. I knew what was happening.

Q Did you in any excited fashion say to Mr. Picciurro in sum or substance that, would you feel better if I left than stayed?

A No. Hank already said I think it is time to sever this relationship, and looked me dead straight in the eye when he said

it, and I said if that's how you feel I should leave. He shook his head, yes, and I walked out the door.

Q Did you interpret that to mean you are fired at that time?

A There is no other way to interpret it to me. If your boss is saying it is time to sever your relationship, it is time to be severed.

Q Incidentally, after this conversation took place you called your husband from your office?

A I went directly to my office and called my husband to please pick me up, and said that Hank had just fired me.

(Tr. at 202–203).

Croce testified that her opinion that she was fired was confirmed by a letter she received from Picciurro dated December 30, 1987 (Plaintiff's Exh. 14) which reads as follows:

Dear Phyllis:

As agreed, enclosed is a check for $7,000.00 representing the adjustment in your earnings which I had promised you last year. It is our understanding that this money represents any monies promised to you under any understanding that you and I have had.

Despite what has happened concerning your association with V.I.P., I still consider you a friend, *and hope that at some point in time, you will understand why the severing of our relationship is necessary.*

I wish you and your family all the luck and success that one can have. (emphasis supplied).

There is additional evidence that the plaintiff was discharged by Picciurro at the meeting on October 21, 1987. At the conclusion of the meeting that day, Croce called Picciurro's personal secretary, Patricia Crowley, and told her, "Hank fired me." Picciurro's sister Mary Ann Tessler, the VIP bookkeeper, testified that on that day, just before the meeting at 4:00 or 4:30 p.m., Croce told her several times, "Hank is going to fire me." Croce told her this at least five times that afternoon. Later Croce told Tessler, "See, he fired me. I told you he was going to fire

me." One-half hour later, Croce came into the office with her husband and they boxed her office belongings and left.

There is some evidence that Croce left on her own volition. Wakschal testified to that effect. However, the strong weight of the evidence is that Croce was discharged by Picciurro at that time. Indeed, Milton Gutman, Office Manager of the Victory Boulevard office, testified that he had a conversation with Picciurro about a day after the October 21, 1987 meeting. At that time, Picciurro told him that Croce "had been terminated." (Tr. at 827).

The Court finds that the words "why the severing of our relationship is necessary" in the Picciurro letter are evidence that the plaintiff was indeed discharged by VIP. In addition, VIP placed an advertisement in the Staten Island paper to appear on October 21, 1987, the day of the plaintiff's separation. This ad had to be placed some days prior to October 21st. In the ad the contact person was Pat Crowley and not Croce, who formerly was the contact person. Prior to October 21st, VIP knew that the plaintiff would no longer be the contact person. Based on all of the evidence in the record, the Court finds that Picciurro, acting on behalf of VIP, discharged the plaintiff at the meeting on October 21, 1987.

At the time of the plaintiff's termination her salary was $40,000 per year. In addition, Croce was entitled to vacation benefits of three weeks per year. Following her termination and a period of unemployment, in 1988 Croce obtained a position with Century 21 for a few months. She then opened her own real estate management company.

Henry P. Picciurro, the sole officer and shareholder of VIP, testified that most of his employees, and at one time all four Office Managers, were women. Picciurro described the plaintiff's jobs and duties with VIP. She was the Office Manager of the Clove Road office and she was also responsible for training salespersons. Ultimately, she gave up the managership of the Clove Road office and was in charge of advertising, recruitment and training for all four offices. Picciurro testified that he never talked to the plaintiff about gender and never told her to hire men in preference to women. The Court does not credit this testimony and finds that Picciurro did indeed discuss gender with Croce and others with regard to the position of General Manager.

With regard to the plaintiff's performance, Picciurro testified that, "Sometimes she was very good. Sometimes she was not very good." However, in 1987, Picciurro "found her performance level to be deteriorating." In the twelve months prior to October 21, 1987, Picciurro "saw a noticeable change in her demeanor, and the performance level and her sense of control seemed to diminish." He described her conduct as being volatile.

Picciurro testified that in 1986 when he entertained the idea of having a general manager, he sat down with Croce with the intention of "trying to give her the position." His testimony in this regard is as follows:

Q What, if anything, did you do when you decided that you were going to hire a general manager?

A I sat down with Mrs. Croce on a number of occasions and trying (sic) to give her the position.

Q Would you be more definitive and more specific as to what you did with her with respect to the position of general manager?

A Okay.

I had a number of conversations with her and offered her the position. The problem that we had with her accepting the position was that she insisted on having the authority to fire the managers if she was not satisfied with their performance. I had said that I reserved the right to fire the managers because I didn't believe that she had the ability to make that decision.

Q How frequently did you have those discussions with her?

A They were ongoing for several months.
(Tr. at 293–294).

Picciurro retained a search firm which presented candidates to him. He interviewed the candidates including two women, and finally selected Carmen Mastrangelo. He was followed as General Manager by Stephen

Wakschal. Croce did not get along with Wakschal and she would not work with him. According to Picciurro, the two didn't mix, they were like "oil and vinegar." These differences and lack of harmony between Wakschal and Croce were causing problems in the company and led to the meeting that took place on October 21, 1987. At that time the plaintiff was having personal problems and, according to Picciurro, "he couldn't fire her ... because of (her) personal problems that she had and I was fond of her and I felt sorry for her." (Tr. at 319).

Picciurro's version of the October 21, 1987 meeting was that he told Wakschal and Croce that they had to work together and the following occurred:

THE WITNESS: At that point Mr. Wakschal said that I'll show you that Mrs. Croce can't work with me and he said to Mrs. Croce, "what do you think of me?" And Mrs. Croce says "I think you're a liar." And Mr. Wakschal then said "do you see what I mean?

Then there started to be banter back and forth between Mrs. Croce and Mr. Wakschal and I kept saying to Mrs. Croce, please, Phyllis, calm down and I kept saying it over and over again to her. And I said "Phyllis, please, stop this so we can have a meeting that would be meaningful." No matter what I said it didn't have any influence on her.

She then just looked at me and said "would it make it easier for you if I left?" And I looked at her and I said "yes."

Q Did you tell her she was fired?

A Absolutely not.

Q When you asked her to leave, was it your intention to fire or to discharge her?

A No.

Q What happened after that?

A Mrs. Croce went out of the office. Myself and Mr. Dey (sic) and Mr. Wakschal stayed in my office.

. . . .

Q Would you continue, Hank, describing to the Judge what happened after Mrs. Croce left.

THE COURT: Before you do that, you said, Mr. Picciurro, that the plaintiff said to you "would it make it easier if I left."

THE WITNESS: Yes.

THE COURT: Is that her exact language?

THE WITNESS: As close as I could think.

THE COURT: And you said what?

THE WITNESS: I looked at her probably for a minute or two and then said, yes.

THE COURT: And then she left?

THE WITNESS: And then she left.

THE COURT: Okay.

BY MR. RUSSO:

Q Was anything else said by you or her before she left?

A I really asked her to stay but she wouldn't stay, she just walked out of the room. And then I said to Mr. Wakschal and Mr. Dey (sic), I don't know if she left, meaning she left the meeting or if she left because she was leaving for good.

Q When you say you wanted her to stay, did you say anything to her about staying and not leaving?

A Yes.

Q What did you say?

A I said, Phyllis, stay, don't leave. And she walked out of the room anyway.

Q What happened after that?

A I don't know precisely what happened over the next few minutes, but within a half an hour Mrs. Croce's husband arrived at the office with Mrs. Croce. I don't know if she left the building or didn't leave the building. Apparently came back—

Q Where was her office apparently at that time?

A The office next to mine.

Q Okay.

A She apparently came with boxes and then took whatever articles that she wished to take from her office and left.

Q Did you see Mrs. Croce after that?

A No.

(Tr. at 321–324).

The Court notes that when Croce called Wakschal a liar, with regard to the allocation

of a $2500 prize, it ultimately was determined that Croce was correct and that she was justified in making that assertion. As it turned out, Picciurro was not satisfied with Wakschal's work and he left VIP on March 4, 1988, based on a mutual agreement that the relationship should cease.

Throughout his testimony Picciurro insisted that gender was never a factor in employing a General Manager or anyone else at VIP.

### The Non–Discriminatory Reasons Advanced by VIP

VIP contends that it has articulated valid non-discriminatory reasons for not promoting Croce, namely, (1) that Picciurro would not relinquish his exclusive power to fire the Office Managers, and (2) the problems with Croce's work performance and personality in that she was difficult to work with; she was unduly harsh and abrasive with her co-workers; she lacked the tact and skill to constructively assess and encourage management of the branch offices; she was insubordinate and demoralizing; she was adversely affected by personal difficulties; and there was a progressive deterioration in her work performance.

On cross-examination Croce testified that she was occasionally absent from work, sometimes without permission from Picciurro. Further, she conceded that she had disagreements and arguments with her fellow employees, which came to Picciurro's attention. In addition, she shared some "personal difficulties" and "marital problems" with Picciurro, including infidelity on the part of her husband. Croce admitted that sometimes she came back from lunch after having consumed alcoholic beverages. Croce also testified that she had problems with her son who was marrying a woman that she objected to. Significantly, Croce conceded that this problem with her son interfered with her work at VIP and, on one occasion, caused friction with Picciurro, at which time she "behaved very badly." (Tr. at 184–185).

Picciurro testified that, for the twelve months prior to October 21, 1987, her work performance was deteriorating. At Managers' Meetings she would berate the manag-

ers, making it very difficult to discuss business with them. As a result of her personal problems with her husband and her son, "there were periods of time she wouldn't show up."

Prior to hiring Carmen Mastrangelo, Picciurro had conversations with Croce with regard to the General Manager position:

Q Do you recall what those conversations consisted of?

A Even though I was going through the procedure of trying to find the general manager, I was still having conversations with Mrs. Croce and on a number of occasions I thought we would come to a conclusion, but again she insisted on the authority to fire the managers and I would not allow that.

(Tr. at 305).

After Mastrangelo was terminated on April 18, 1987, Picciurro again had conversations with Croce with regard to the General Manager position, as follows:

Q And what, if anything occurred in terms of the general manager's position between April 18, 1987, and the subsequent two months later?

A I was having some conversation with Mrs. Croce to again take over the position, but again for the reason that I mentioned before, this requirement on her part that she have the authority to fire managers was not something that I was—that I would allow to be taken, so we couldn't get together.

(Tr. at 308–309).

Susan Levoyer also testified that she discussed the General Manager position with Croce. In these conversations Croce told her "that if she wanted to be general manager she could at any time, but she would not accept the position unless she was able to fire anybody she wanted."

The Court finds that neither Mastrangelo nor Wakschal as General Manager had the power or authority to fire managers. Picciurro always retained that power to himself.

The other reason advanced by the defendant for failing to promote the plaintiff to General Manager and ultimately in terminat-

ing her employment, was Croce's personality as it affected her performance and her relations with her co-employees. Picciurro testified that Croce was very aggressive, volatile and lacked refinement and grace. Asked to relate whether Croce would have made a good General Manager, Picciurro testified that Croce's main concern was not VIP but her own power in the company; Croce had to control people; and she would work on the weaknesses of her fellow employees, such as the attire of certain employees and the ability of other employees.

Picciurro acknowledged that Croce had certain strengths. She "was fairly good at training. She was very, very aggressive which is probably her strength and weakness." In addition, according to Picciurro, the plaintiff informally assumed the position of General Manager without a formal appointment; she just assumed the position, or as Picciurro testified "she appointed herself, because she was aggressive, bold and volatile" (Tr. at 412).

Asked to describe Croce's behavior, Picciurro testified as follows:

Q Tell us what your impressions and observations were at that time with respect to the morale of the people that were working for you, the managers as well as say personnel?

A The morale was down. The managers didn't even want to come to the weekly managers' meetings.

MS. BAILY: Objection. Hearsay.

THE COURT: No, it's not hearsay because that is direct evidence because he could see who was there at the meeting.

MS. BAILY: But we haven't established that he was at the meetings we're talking about.

THE COURT: Were you at the meetings?

THE WITNESS: I absolutely was at the meetings.

BY MR. RUSSO:

Q Would you continue?

. . . .

A I can say on a number of occasions, one or two of the managers walked out of the meeting.

Q Why?

A Because of being berated and put down.

MS. BAILY: Objection. That calls for the operation of a person's mind. He doesn't know that.

THE COURT: Well, if it were under circumstances that it would indicate to a reasonable person that's why, I would permit it.

MS. BAILY: But there is no foundation to that.

THE COURT: At this point there isn't. But I will let him lay a foundation.

Why do you say they walked out, because of Mrs. Croce?

THE WITNESS: One, the frustration that the meetings could not get anywhere because she had to completely control them and not talk about things that were positive in nature that we were trying to attain.

Secondarily, they would be called names. They would be berated. The temper of the meetings took on a very non-professional conduct because of her presence and her control and how the meetings were lessened by her conduct.

BY MR. RUSSO:

Q Was Mrs. Croce a good influence in your business in 1986 and 1987?

A Absolutely not.

. . . .

Q The question was, was her conduct of such a nature as to adversely affect your business?

A Absolutely yes.

(Tr. at 440–442).

Johanna Lattinelli testified on behalf of the defendant. The Court finds that Lattinelli is a credible witness and accepts her testimony as true. She resides in Fort Lauderdale, Florida and appeared voluntarily to testify in this case. Lattinelli is a licensed real estate person, who had five years of real estate

experience prior to being hired by VIP in 1985. She was employed by VIP until December 1986. Lattinelli worked in the Victory Boulevard office as a salesperson for two or three months and was then promoted by Picciurro to Office Manager to replace Kathy Hartman.

Lattinelli first met the plaintiff at her training sessions. She thought that the meetings were well-handled and that Croce "knew her job." As an Office Manager, Lattinelli was required to attend the meetings of managers at least once a month. Croce conducted these meetings. Asked to describe the meetings Lattinelli testified as follows:

Q And did you attend every one of those meetings throughout the time period that you were the manager?

A I'm sorry to say I did.

Q What do you mean by that, you are sorry to say you did?

A Because they were horrible.

THE COURT: Horrible?

THE WITNESS: I'm sorry, horrible.

BY MR. RUSSO:

Q In what way were they horrible?

A Because it was absolutely—it was not done, it was not held in any kind of a business fashion. If you came up with an idea or suggestion, you were bombarded.

Q By whom?

A By Phyllis. Phyllis.

Q Yes.

A She would try to put everyone down, even though we were doing the very best job we knew how, and it was just chaotic.

We all left there, meaning Maddie, meaning Kathy, meaning myself, and then whoever came later, Susan or whoever, everyone was walking away in tears. So they were not healthy by no means. They were not healthy meetings.

(Tr. at 467–468).

Further, Lattinelli testified that her business relationship with Croce "was the poorest relationship I ever had ... in my entire business life.... because there was just no talking to her ... there were no sane discussions, there was absolutely nothing you could do with this lady." (Tr. at 473–474). Latti-

nelli said she has been working for 42 years and she never "came up with this."

As to Croce's relationship with the salespersons at the Victory Boulevard office, Lattinelli stated:

A There was nothing good about it. She was always erratic. Maybe for five minutes she may be okay, but then the next half-hour she would be off and running. She was always putting people down. She wasn't good for Hank's business. She did not help it. She helped to destroy it, that's what she did. Because there was no business because everybody left. I mean—

(Tr. at 474).

Lattinelli also testified as to a luncheon meeting she had with Croce at a diner in 1985 or 1986, at Croce's invitation:

Q Would you tell the Court, please, in your own words, Ms. Lattinelli, what happened at this luncheon?

A We just had a sandwich and a cup of coffee and she told me she really didn't think I belonged in this company. She really didn't think I was going to make it. She thought I should have a career change, consider something else. "Have you ever considered something else? And if you don't, if you remain to stay here, I will destroy you."

Q She said what?

A I will destroy you.

Q What did you say?

A I said, "how do you plan to do that?"

Q Did she give you an answer?

A No, I don't remember if she did.

Q Was there anything else exchanged or said between the two of you at this luncheon?

A Those were the words I remember. I really don't remember anything else. I remember those words strongly.

(Tr. at 476).

In addition, Lattinelli testified that Picciurro always treated her well, gave her constructive criticism and "gave me the feeling of independence as a woman and that I could do it." Lattinelli described Picciurro as "fair, honest, sincere, overworked ... well respect-

ed" and "the best real estate man on Staten Island at that time." Asked about Picciurro's hiring preferences with regard to managerial positions, she stated that "he gave all the women that were capable a position."

Lattinelli also testified that at Career Night meetings Croce's breath smelled of liquor:

Q Now, did you ever attend any general meeting at which Phyllis Croce was present?

A Yes, I did.

Q Can you recall any events involving Mrs. Croce at these general or career night meetings?

A Yes.

Q Would you please recount those to the Judge, please?

A The only thing I can remember when I think about it and it's very vivid in my mind, I always wanted to run out.

Q Why?

A Because, A, she always—her breath always smelled of liquor because they were always held around 7 o'clock at night.

B, she would pick on the people and just demoralize them, put them down. I mean it was nothing—it wasn't an uplifting experience. I felt like I was with Hitler, she was Hitler and we were all there being crucified.

She does have attributes, if she only knew how to work with that and control her mind, she would have done wonders.

Q In your opinion, was she a good influence in the business?

A Definitely not. Definitely not.

(Tr. at 478–480).

Lattinelli conceded that alcohol was served at some VIP meetings. Lattinelli left VIP in December 1986 for two reasons. The main reason was that she couldn't work with Croce. Lattinelli felt that Croce had too much power "which she should never have had." The second reason was that she received an inheritance and opened her own business.

Patricia Crowley was employed by Picciurro for approximately sixteen years. She was his personal secretary at VIP. Crowley started working for VIP in 1980 and she retired on February 3, 1996. She never heard Picciurro say anything about preferring men over women in employment. Crowley worked on the same floor as the plaintiff at the Clove Road office. She was present when Croce interacted with other VIP employees. Crowley described the plaintiff as "domineering," "overpowering," "very forceful" and "very aggressive."

Q Did it ever come a point where it affected you emotionally? Did you cry?

A Not over that, no.

Q What did you cry over?

A Yeah, I did. I did. There was one time, I don't know exactly what Phyllis was trying to get at, but she came to me and started saying something about I was replaceable, everybody was replaceable and she just badgered me. I don't know what point she was trying to get across to me but she was relentless and had me in tears and I don't know what she was trying to do.

(Tr. at 517).

Crowley also testified that Croce had a bottle of vodka in her desk drawer and she offered her some to put in her coffee. Crowley stated that Croce "had a way of badgering people . . ." However, she testified that, as the Manager of the Clove Road office, Croce "did her job" and she got the salespersons listings and made them work.

Mary Ann Tessler is the sister of Picciurro and worked as a bookkeeper for VIP for twenty years from July 1976 to March 1996. She worked with Croce and saw her on a fairly regular basis. Tessler described Croce's relationship with her co-employees as erratic. Croce was "friendly one moment and then suddenly she would get very angry." Tessler related the incident with secretary Crowley when she drove her to tears by telling her that she could be replaced. Tessler also testified about a drinking problem:

Q What other problems were there?

A There was a problem with drinking.

Q Well, would you tell the Court what that problem consisted of?

. . . .

A On one particular morning I think I was over by the copy machine, it was maybe about 10 o'clock in the morning, and Phyllis was in the back at the back desk. And I just turned around either to say something to someone or to make a comment and Phyllis was at her desk with a small bottle of liquor and was drinking it straight out of the bottle.

Q Where was she at the time?

A She was at her desk.

Q Do you know what she was drinking?

A It was clear. It was a clear liquid.

Q Did you smell any alcohol on her breath?

A Yes. I had smelled alcohol on Phyllis' breath on many occasions.

Q Over a period of time?

A Over a period of time.

Q Over how long a period of time?

A I would say basically for the amount of time that Phyllis was there.

. . . .

Q Was her ability to perform her duties affected in any way?

MS. BAILY: Objection.

THE COURT: Well, could you tell whether the fact that you smelled alcohol on her breath had a relationship to her duties? Could you tell us that?

THE WITNESS: The only way I could say it had any sort of a relationship to her duties, is that she—her behavior would become—she would get louder. She would become more boisterous and repeat and repeat. That's one of the problems I would have with Phyllis is that she would take a subject to me and repeat the same thing so many times over.

She would get very loud, very, very loud. (Tr. at 540–542).

However, Tessler conceded that liquor was served at Career Nights and Award Nights and at those occasions VIP employees drank together, including Tessler and Croce. Also, sometimes in the Clove Road office late on Friday afternoons people would drink togeth-er. Tessler attended the Award Nights and Career Nights meetings and she did not observe anything unusual about the manner that the plaintiff conducted herself at the meetings.

Susan Levoyer is the fiancé of Picciurro. They have been engaged for two years. Levoyer was employed by VIP since 1984, starting as a sales agent. She was recruited for the position by Croce. On occasion, Levoyer and her former husband socialized with Croce and her husband. At the Clove Road office Levoyer had an opportunity to observe Croce on a frequent basis. She testified that "her demeanor at times was very erratic . . . she was abusive to a lot of the other salespeople in the office . . . she liked to harass people." Levoyer stated that for some reason Croce was abusive to her only "at times." Also, according to Levoyer, the plaintiff would harass and abuse the people being trained by her.

Levoyer was the Office Manager of the Clove Road office during the period from January 1, 1986 to July 1987. During that period Levoyer attended Managers' meetings two or three times a month. She testified to what she observed at these meetings:

Q I would like to have you, Susan, describe to the Court, please, what you observed regarding Phyllis' involvement, participation, her demeanor during the course of these business manager meetings?

A Phyllis was very abusive to all of the managers, including myself, including Johanna, Maddie Pearlman, (sic) not so much Jerry because she was on an a friendly basis with Jerry because Jerry was more reserved.

. . . .

THE COURT: You characterize certain things. What did she say that made you think that she was abusive, for example?

THE WITNESS: She would say—the way she would speak to people would be in a tone that would demean them. For instance, she would turn and say "how can you do something so stupid?" Or "what is wrong with you?"

She would laugh at people when they—for instance if I brought something up, maybe we can do or have an open house and hold wine—I'm sorry, I'm very nervous right now.

Can I take a moment to compose myself?

(Tr. at 580, 582).

Also, at an Awards Night meeting in October 1987, Levoyer described an incident where Croce announced in front of the whole company, that a sales agent's husband "lost a great deal of money in the stock market," causing the agent to be upset and leave the meeting.

Levoyer discussed the Managers' Meetings held when Carmen Mastrangelo was the General Manager. She stated that Croce "would laugh at him and say 'this is bull shit'" and would ridicule Mastrangelo. Also she described meetings with Wakschal, when he was General Manager:

Q Just tell us about those meetings at which Phyllis Croce was present with Steve Wakschal and any other managers.

Was there anything unusual, out of the ordinary, that occurred at any of those meetings at which Phyllis Croce was present?

A Yes.

Q Well, that's what I think the Court would like to hear, Susan. Please describe that.

A She would say to Steve that he didn't know what he was doing. He doesn't belong as a general manager. She would disrupt the meeting by being very loud. She would—it was just—

MS. BAILY: Objection.

THE COURT: I didn't hear what she was going to say. You are anticipating.

THE WITNESS: Yes.

THE COURT: It was just what?

THE WITNESS: It was just a horrible place to be when she was there.

(Tr. at 595–596).

Stephen Wakschal was employed by VIP from 1985 to mid–1988. He received his training from Croce. He testified as to his observations as to Croce's performance with the company:

Q And what were those observations, sir?

A If I had to sum it up in one word it would probably be divisive. Attempts were constantly made to set up small groups of people, setting groups of people of two or three against other groups of people within the office.

There was behavior which I guess I could recall just erratic, at times loud, at time boisterous. That would be the best way to describe it.

. . . .

Q Can you describe to the Court, please, what your observation of Mr. (sic) Croce's behavior at these classes you attended?

A Generally Mrs. Croce berating the potential salespeople, the new employees. The style was to give reading assignments from some prepared materials, have the person read the material and then start screaming at them.

. . . .

Q Can you characterize or define or describe the tenor, the other fear that pervaded the training classes?

A It was pretty tense. Everyone sought to avoid eye contact with Phyllis and you really didn't want to get called on to read because you knew you would then be berated.

(Tr. at 769, 772–773).

However, Wakschal signed an affidavit for EEOC stating that Croce's training was effective. On June 19, 1987, Wakschal was appointed General Manager. In that position he conducted the Managers' meetings. He testified that Croce attended some of these meetings and was so disruptive, loud and boisterous that he asked her not to attend. Asked to describe Croce's interpersonal relationships with the other employees, Wakschal stated that Croce was divisive and tried to set up conflicts within the company. Wakschal also testified about Croce's drinking:

Q At any other time for that matter or at this meeting did you ever observe Mrs. Croce to be under the influence of alcohol?

A On numerous occasions—

Q Can you describe, Mr. Wakschal, for the Court, please, what your observations were that led you to believe that Mrs. Croce was intoxicated on many occasions?

A The most dramatic was alcohol on her breath on several occasions. At other times an unsteady gait, erratic behavior, very frequent mood swings from being very calm, complacent to very quickly shifting to a very loud, boisterous, gregarious presentation.

(Tr. at 787–788).

Wakschal testified that he remained as General Manager until April 4, 1988. He attributes his leaving to the general downtrend in the real estate market occurring at that time. He stated that he suggested to Picciurro that a General Manager was no longer needed.

In support of the plaintiff's case with regard to her personality and performance and to attempt to negate the overwhelming evidence of Croce's aggressive and divisive work habits, the plaintiff produced witnesses Gutman, Goldstein and Liang. Milton Gutman testified that he replaced Johanna Lattinelli as the Manager of the Victory Boulevard office. Croce trained him and believed in him.

Kate Goldstein worked at VIP as a sales representative from 1985 to March or May in 1988. Croce hired and trained her. Goldstein was "quite impressed" with Croce who told her that "I am the best trainer and no other company will give you that." Croce "seemed to be a motivator, she was vivacious ... (and) I felt I can connect with her ... and I just wanted to work with her." At subsequent training classes Croce "had an upbeat and motivational style." Goldstein saw alcohol consumed at office parties, award dinners, and sometimes in the office. "They pretty much guzzled a lot of alcohol," there was a lot of drinking. Everyone consumed alcohol except Goldstein and Milton Gutman. She never saw Croce drinking alone.

Michael Liang, a VIP employee from 1984 to 1991, testified that Croce was an effective, friendly and professional real estate employee. He also stated that her interaction with other employees was effective, authoritative and business-like. However, when asked whether Croce had any problems with other employees at the Clove Road office, Liang guardedly stated "In general, no."

However, the Court notes that Liang may have a bias against Picciurro. It seems that Susan Levoyer, now engaged to Picciurro, was Liang's former wife. Further, he is apparently in arrears for child support payments to Levoyer in the sum of $44,700. In this regard, Liang sent a letter to Levoyer dated February 18, 1996 (Defendant's Exh. D) in which he accused her attorney of drawing up "fraudulent divorce documents," and asked her to stop "harassing me." In his letter to Levoyer he stated, "Please do not force me to take steps to protect myself." Faced with this evidence Liang conceded that he was "displeased" with his former wife.

Liang also conceded that, a few days prior to testifying in this case, he had a telephone conversation with Levoyer in which he told her that Croce asked him to testify on her behalf. However, Liang denied that he threatened to hurt Levoyer by his testimony on behalf of Croce. Further, Liang testified at first that he was subpoenaed by the plaintiff two days before his court appearance, but then admitted that he received the subpoena in the witness room on the day he testified. Also, Liang admitted that in 1986 Croce tried to fire him because he "might have said" that Croce "ought to go home and sober up because she was drunk." He also concedes that he disagreed with a lot of things Croce and he worked on together.

On the totality of Liang's testimony, the Court does not find him to be credible with regard to his laudatory description of Croce's activities at VIP. The Court finds that Croce's activities at VIP in 1987 were, in part at least, divisive, erratic, confrontational and counterproductive.

## DISCUSSION

### I. *Jurisdiction*

VIP contends that it was not an employer within the meaning of Title VII and thus, is not subject to liability under this Federal Civil Rights statute. The defendant argues that it did not employ fifteen or more employees because its sales staff were independent contractors.

■ Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII") defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year ..." 42 U.S.C. § 2000e(b). An employee is defined as "an individual employed by an employer." 42 U.S.C. § 2000e(f). In order for VIP to be deemed an "employer" within the meaning of Title VII and thus to be amenable to a Title VII cause of action, it must have at least fifteen employees. *See, e.g., Kern v. City of Rochester*, 93 F.3d 38 (2d Cir.1996).

■ Whether a person is an "employee" or an "independent contractor" is discussed by the United States Supreme Court in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–24, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992). Where a statute containing the term "employee" does not helpfully define it, the common law agency test should be applied. The common law agency test contains "no shorthand formula or magic phrase that can be applied to find the answer ... all of the incidents of the relationship should be assessed and weighed with no one factor being decisive." *Id.* at 324, 112 S.Ct. at 1349 (citation omitted); *see also Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir.1993).

With respect to the definition of an employee as related to a real estate salesperson, in *Breen v. Hunt Real Estate Corp.*, 65 FEP Cases 1392, 1994 WL 417017 (W.D.N.Y.1994), it was held that the plaintiff salesperson was an independent contractor. However, in *Breen*, the Court found all the common law agency indicia of an independent contractor. In particular, the Court found that the defen-

dant realtor did not exercise day-to-day control over the salespersons.

In this case, the Court need not determine whether, applying the common law agency rules, the VIP salespersons were employees or independent contractors. Here, the Court finds that the plaintiff established the fifteen employee requirement without the need to address the status of the salespersons. The Court finds that, during the periods at issue each VIP office had a full time secretary and full time receptionist. The Court further finds that in the twelve month period prior to the plaintiff's separation from employment on October 21, 1987, VIP employed the following persons who were "employees" and not salespersons:

| | |
|---|---|
| 4 | Office Managers |
| 1 | General Manager |
| 1 | Bookkeeper |
| 1 | Manager—Commercial Division |
| 1 | Director of Personnel & Training |
| 1 | Assistant to the General Manager |
| 1 | Personal Secretary to President Picciurro |
| 4 | full time Secretaries for each of the 4 real estate offices |
| 4 | evening receptionists for each of the 4 real estate offices |
| 4 | weekend receptionists for each of the 4 real estate offices |

Total: 21 employees

■ In addition, there are documents in evidence, created by VIP, which indicate that it had more than fifteen employees. On April 30, 1987, the defendant filed a report with the New York Department of Labor in which it was required to "List your employees below" (Plaintiff's Exh. 39). In this form, President Picciurro listed 22 "employees." On July 31, 1987, in a similar form, President Picciurro listed 27 "employees." Similarly, on October 26, 1987, the defendant listed 23 "employees," and on January 2, 1988, it listed 20 "employees." The Court notes that these forms excluded the four office managers and the plaintiff, who were additional "employees."

542

Accordingly, the Court finds that the plaintiff proved that the Title VII threshold requirement of "fifteen or more employees" has been met. The Court will now turn to the merits.

## II. *The Applicable Standard*

Employment discrimination cases fall into one of two categories, (1) the *McDonnell Douglas–Burdine–Hicks* "pretext" case, or (2) the *Price Waterhouse* "mixed motive" case.

### A. *The McDonnell Douglas–Burdine–Hicks "Pretext" Cases*

 The standards of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 802–05, 93 S.Ct. 1817, 1822, 1824–26, 36 L.Ed.2d 668 (1973) are intended "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981). The plaintiff has the burden of establishing a *prima facie* case of unlawful discrimination. This burden of proof is a light one. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. In the first tier of the *McDonnell Douglas* standard to establish a *prima facie* case in this national origin discrimination case, the plaintiff in this case must prove four elements:

(1) the plaintiff is a member of a protected class;

(2) the plaintiff was qualified for the job she held at the time of the failure to promote her and/or at the time of her termination;

(3) the plaintiff was denied promotion and/or was terminated from her job; and

(4) the failure to promote her and/or her termination occurred in circumstances giving rise to an inference that it was based on the plaintiff's gender.

 The next two tiers are described in *Chertkova v. Connecticut General Life Insurance Co.,* 92 F.3d 81 (2d Cir.1996). If the plaintiff presents a *prima facie* case, a presumption of unlawful discrimination arises. In the second tier, the burden of production

shifts to the defendant-employer, who is required to demonstrate a legitimate non-discriminatory reason for the failure to promote and/or for the termination. *See Gallo v. Prudential Residential Services, Inc.,* 22 F.3d 1219, 1226 (2d Cir.1994). In the third tier, if the defendant-employer satisfies this burden of production, the plaintiff then has the ultimate burden to prove that: (1) the employer's reason was merely a pretext and was not the true reason, *and* (2) that the real reason was gender discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2751–52, 125 L.Ed.2d 407 (1993); *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123 (2d Cir.1996). Thus, even if the defendant's reasons are found to be pretextual, the plaintiff must, nevertheless, prove that the failure to promote her and/or her termination was as a result of intentional gender discrimination. "It is not enough ... to disbelieve the employer: the factfinder *must* believe the plaintiff's explanation of intentional discrimination." *Hicks,* 509 U.S. at 519, 113 S.Ct. at 2754. However, this proof may be inferred from proof of the four elements of the *prima facie* case.

### B. *The Mixed Motive Theory*

 Under the mixed motive theory, a plaintiff "must initially show more than the 'not onerous' *McDonnell Douglas–Burdine* factors." *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.) *cert. denied* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The burden of proof on the plaintiff is more stringent in a "mixed motive" cases than in a "pretext" case.

 The "mixed motive" standard was recently reiterated in *de la Cruz v. New York City Human Resources Administration Department of Social Services,* 82 F.3d 16 (2d Cir.1996), as follows:

In a "mixed motives" case, a plaintiff must initially proffer evidence that an impermissible criterion was *in fact* a "motivating" or "substantial" factor in the employment decision. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794–95, 104 L.Ed.2d 268 (1989); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121

L.Ed.2d 46 (1992). This burden is greater than the level of proof necessary to make out a *McDonnell Douglas prima facie* case. Once the plaintiff offers such evidence, the burden shifts to the employer to demonstrate that it would have reached the same decision even in the absence of the impermissible factor. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Tyler,* 958 F.2d at 1181.

*Id.* at 23.

 The key question in a mixed motive inquiry is what the plaintiff has to demonstrate in order to trigger this theory. In the Second Circuit, the plaintiff is required to adduce "enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were 'because of' an impermissible factor." *Id.* at 1187. The Second Circuit rejected the notion that the plaintiff must introduce "direct" evidence of discrimination, such as an admission by the decisionmaker that "I fired the plaintiff because she was a woman," as opposed to circumstantial evidence. However, if the plaintiff relies on circumstantial evidence, "that circumstantial evidence must be tied directly to the alleged discriminatory animus." *Ostrowski v. Atlantic Mutual Ins. Co.,* 968 F.2d 171, 182 (2d Cir.1992).

If the plaintiff is able to produce evidence to establish that an impermissible factor played a motivating role in the challenge of employment decisions, the defendant is then given an opportunity to prove an affirmative defense, namely, that the "defendant would have reached the same decision as to the employee's employment even in the absence of the impermissible factor." *Tyler,* 958 F.2d at 1181 (*citing Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88).

Under the particular facts of this case, the Court finds that the plaintiff has established the more stringent "mixed motive" case. However, as the following analysis is designed to demonstrate, the plaintiff cannot prevail under either theory of employment discrimination.

### III. *The McDonnell Douglas–Burdine–Hicks Analysis*

As to the first tier, the Court finds that the plaintiff has proved a *prima facie* case. The first element is satisfied because the plaintiff is a member of a protected class, namely, she is a woman. The second, third and fourth elements are contested by the defendant.

 The second element that the plaintiff must prove, by a preponderance of the evidence, is that the plaintiff was qualified for the position of Director of Personnel and Training at VIP. The question presented is whether the plaintiff was reasonably competent and was performing her job at a level which met her employer's reasonable and legitimate expectations. *Douglas v. PHH FleetAmerica Corp.,* 832 F.Supp. 1002, 1009 (D.Md.1993).

 In *Owens v. New York City Housing Authority,* 934 F.2d 405, 409 (2d Cir.1991), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991) it was held that a plaintiff needs "only a minimal showing of qualification to establish a *prima facie* claim." In addition, it was stated in *Owens* that an employee "only needs to demonstrate that [she] possesses the basic skills necessary for performance of the job." However, "in a discharge case the requirement that the plaintiff be qualified for the job in question requires some allegation demonstrating satisfactory performance at the time of the discharge." *Dugan v. Martin Marietta Aerospace,* 760 F.2d 397, 400 (2d Cir.1985).

 The Court finds that the plaintiff has established, by a preponderance of the evidence, that she was qualified for the position of Director of Personnel and Training at VIP on October 21, 1987. All of the co-employees of the defendant testified that Croce was competent and knowledgeable in the real estate field. In fact, Picciurro conceded that Croce was qualified to be the General Manager. While most of the witnesses stated that she had serious personality problems, which created havoc in the company and was counterproductive, which the Court will discuss later in this opinion, no one seriously questioned her competence in the real estate field.

As to the third element, VIP asserts that Croce was not discharged on October 21, 1987. VIP contends that Croce left in a "pique of temperament on her own volition" (see Defendant's summation). The Court disagrees and finds that Croce was discharged by Picciurro on behalf of VIP at the climactic meeting on October 21, 1987. In addition, it is conceded that she was not promoted to General Manager on the two occasions Picciurro selected a male for that position.

As to the fourth and final element that the plaintiff must prove to make out a *prima facie* case of intentional discrimination, the Court finds that the plaintiff did establish that the failure to promote her to General Manager on two occasions occurred in circumstances giving rise to an inference that it was based on the plaintiff's gender. The Court's findings in this regard, discussed later in this opinion with regard to the "mixed motive" analysis, are equally applicable to this element.

However, the Court finds that the plaintiff failed to prove that her termination on October 21, 1987, occurred in circumstances giving rise to an inference that it was based on the plaintiff's gender. On the contrary, the Court finds that the plaintiff was discharged at the meeting on October 21, 1987 because of an argument that occurred during the meeting, and, in part as a result of the plaintiff's argumentative, combative and divisive manner. In sum, the Court finds that, unlike the failure to promote her to General Manager, the plaintiff's discharge on October 21, 1987 had nothing to do with her gender.

The Court will now review the second tier of the *McDonnell Douglas* analysis; namely, the legitimate non-discriminatory reasons advanced by the defendant with regard to the failure to promote her to General Manager. The two reasons advanced by the defendant are (1) the plaintiff declined to accept the position of General Manager without the power to fire Office Managers, and (2) the plaintiff's abrasive work habits and personality defects. As stated in the defendant's post-trial Conclusions of Law, it is alleged by VIP that the plaintiff "was difficult to work with as she was unduly harsh and abrasive

with her co-workers; was lacking the tact and skill to constructively assess and encourage management of the branch offices; was insubordinate and demoralizing; was adversely affected by personal difficulties; and was subject to progressive deterioration in her work performance." (Defendant's Post-trial Memorandum at p. 17).

 The Court finds that these two reasons advanced by the defendant for declining to promote the plaintiff were the true reasons. As stated above, the Court further finds that the plaintiff's discharge on October 21, 1987, was motivated solely by her personality and work problems and not, in any way, as a result of her gender. The Court will outline these findings in detail in the discussion of the defendant's non-discriminatory reasons for their adverse employment decision in the "mixed-motive" portion of this opinion. Accordingly, the plaintiff has failed to establish intentional gender discrimination liability under the *McDonnell Douglas* theory either for the failure to be promoted or with regard to her discharge.

### IV. *The "Mixed–Motive" Analysis*

 The Court finds that the plaintiff established enough evidence that, if believed, could reasonably allow a finder of fact to conclude that the failure to promote Croce to General Manager was because Croce is a woman. As the Court stated during the trial, in this case, the Court finds that there is direct evidence of discriminatory animus strong enough to support a "mixed-motive" theory. With regard to the failure to promote Croce to General manager, the Court finds that Picciurro told the plaintiff on a number of occasions that he "did not want a woman" as the General Manager, that "he considered women too emotional" and that "he felt both men and women prefer to work for men." As stated above, the Court also finds that the plaintiff failed to prove that gender was a motivating factor in her discharge on October 21, 1987.

As to the second phase of the "mixed-motive" theory, the Court finds that the defendant VIP has proved, by a preponderance of the evidence, that it would have reached

the same decisions, not to promote the plaintiff to General Manager, even in the absence of the gender bias of Picciurro.

First, the Court finds that the condition imposed by Picciurro, namely, that he would retain the right to fire the Office Managers was never agreed to by the plaintiff. Second, VIP established, by a preponderance of the evidence, that it would not have promoted the plaintiff to General Manager, regardless of her gender, because of her divisive personality and aggressive and erratic behavior on the job. In this regard, the Court credits the testimony of Johanna Lattinelli, a totally disinterested witness, who voluntarily traveled from Fort Lauderdale, Florida to testify on behalf of the defendant. In the Court's view, Lattinelli was the key witness in this case. In particular, the Court deems significant the testimony by Lattinelli that the Managers' Meetings were "horrible" because of Croce's conduct ..., that "there was just no talking to her ... there were no sane discussions;" "she was always erratic ... always putting people down, ... she wasn't good for Hank's business ... she helped to destroy it." In addition, the Court finds Lattinelli to be believable when she testified that Croce "would pick on the people and just demoralize them ... I felt like I was with Hitler," and that, on one occasion Croce told her "I will destroy you."

In addition, the Court accepts Patricia Crowley's testimony that Croce was "domineering," "overpowering," "very aggressive" and, on one occasion "had me in tears." The Court further finds that the defendant proved that Croce was loud and abusive to some co-employees, conducted herself in an erratic and volatile manner, and, more importantly, was a divisive influence in the company. The Court further finds that Croce had a drinking problem which exacerbated her interactions with her co-employees. Her demeanor caused controversy in the company and was a counterproductive factor.

### IV. Conclusions

The plaintiff failed to prove that her discharge on October 21, 1987, was motivated, even in part, by her gender. Rather, the Court finds that she was discharged because of her erratic, aggressive and divisive personality.

As to the failure to promote Croce to General Manager, the Court finds that those adverse employment decisions were motivated, in part, by her gender. However, the Court further finds that the defendant proved two non-discriminatory reasons for its failure to promote Croce and that the defendant's decisions in that regard would have been the same, even in the absence of gender bias. As stated above, the Court finds that the plaintiff refused to accede to Picciurro's condition that he alone would retain the power to fire Office Managers. Second, the erratic, aggressive and disruptive personality and divisive work habits of the plaintiff also constitute valid non-discriminatory reasons for VIP to have failed to promote Croce to General Manager, even in the absence of gender discrimination.

Accordingly, for the reasons stated, the Court directs the entry of a judgment in favor of the defendant VIP Real Estate, Inc. dismissing the complaint.

**SO ORDERED.**